STATE OF CONNECTICUT *v*. DIOGENES J. BALLAS

COTTER, C. J., LOISELLE, BOGDANSKI, PETERS and HEALEY, Js.

Argued January 10—decision released May 20, 1980

*Alfred J. Jennings, Jr.,* for the appellant (defendant).

*Ernest J. Diette, Jr.,* assistant state's attorney, with whom, on the brief, were *Donald A. Browne,* state's attorney, and *Domenick J. Galluzzo,* assistant state's attorney, for the appellee (state).

LOISELLE, J. The defendant was convicted by a jury of first degree larceny in violation of General Statutes §§ 53a-119 and 53a-122 (a) (2). His appeal raises several issues concerning the procedures which led to his conviction and the sufficiency of the state's evidence.

The first error claimed by the defendant is that his right to due process of law was violated by the trial court's partial denial of his motion for a bill of particulars. The defendant contends that the short form information, as supplemented, was vague and failed to inform him of the conduct which constituted the offenses alleged. The information

accused the defendant "of Larceny in the First Degree and charges that at the City of Danbury in [Fairfield] County, on the 30th day of May 1973, and on the 1st day of June, 1973, the said Diogenes J. Ballas did commit Larceny of the personal properties of Helmut Huber and Paul Leili, valued in excess of two thousand dollars ($2,000), in violation of Section 53a-119 and Section 53a-122(a)(2) of the Connecticut General Statutes." The bill of particulars states that the specific manner in which the defendant is alleged to have violated § 53a-119 is described in subparagraph (2) of that statute, obtaining property by false pretenses; that the properties taken were Huber's money order and Leili's cashier's check; and that the nature of the "false token, pretense or device" involved was Ballas' false representation that the money was to be used to purchase 120 acres of land on Reservoir Road, New Milford, Connecticut, from the estate of one Rosalowski through the Palm Beach Savings Bank, Palm Beach, and that he, Ballas, had arranged financing with that bank for the purchase of the land. If the bill of particulars is to be considered in conjunction with the information; *State* v. *Coleman*, 167 Conn. 260, 268–69, 355 A.2d 11 (1974); the test to be applied is as follows: "[If] the state's pleadings . . . informed the defendant of the charge against him with sufficient precision to enable him to prepare his defense and to avoid prejudicial surprise, and were definite enough to enable him to plead his acquittal or conviction in bar of any future prosecution for the same offense, they have performed their constitutional duty. . . ." (Citations omitted.) *State* v. *Sumner*, 178 Conn. 163, 168, 422 A.2d 299 (1979). We fail to see how the defendant could have been misled as to

the offense with which he was charged. Indeed, the allegations here are more precise than those in *Sumner* because the information specified a violation of § 53a-119 as well as of § 53a-122 (a) (2) and the bill of particulars specified that the state intended to proceed upon a theory of larceny by false pretenses as described in § 53a-119 (2). The court did not err in denying the defendant's motion.

The defendant next claims that the information and bill of particulars fail to state an offense because the bill of particulars alleged that the defendant obtained property by false pretenses; General Statutes § 53a-119 (2); but described the manner in which he did so as false promise. General Statutes § 53a-119 (3). This is inaccurate. The bill of particulars described the general nature by which the defendant obtained the property as misrepresentation of both existing facts and expressed intentions as to what he planned to do with the complainants' money in the future. The allegations clearly state an offense under § 53a-119 and § 53a-122 (a) (2).

The defendant contends that the court erred in denying his motion to dismiss because the warrant for his arrest was issued without a showing of probable cause. He claims that the affidavit supporting the warrant consisted almost entirely of hearsay which without more is insufficient as a matter of law to sustain a finding of probable cause, or, in the alternative, that if the hearsay contained in the affidavit may be considered by the magistrate, the facts contained in the affidavit do not establish probable cause. An affidavit may be based on hearsay information provided "the magistrate [is] informed of some of the underlying circumstances

from which the informant concluded [what he did] and some of the underlying circumstances from which the officer concluded that the informant, whose identity need not be disclosed . . . was 'credible' or his information 'reliable.' " *Aguilar* v. *Texas,* 378 U.S. 108, 114, 84 S. Ct. 1509, 12 L. Ed. 2d 723 (1964); *State* v. *Saia,* 172 Conn. 37, 41, 372 A.2d 144 (1976). In this case, the informants Leili and Huber were the victims of and participants in the crime. *State* v. *Jackson,* 162 Conn. 440, 446, 294 A.2d 517, cert. denied, 409 U.S. 870, 93 S. Ct. 198, 34 L. Ed. 2d 121 (1972). Their stories were told to the affiants in a detailed and consistent manner which related their personal interaction with Ballas. In addition, the affiants swore that Leili and Huber had shown them copies of the $7000 check and the $5000 money order which they had endorsed to Ballas, corroborating their allegations that they had given these amounts to Ballas. The affiants also swore that they had seen Huber's telephone bill listing his long distance telephone calls to Florida, corroborating his claim that he had made such calls to verify Ballas' statements. The affiants verified by their own investigation at the town clerk's office in New Milford that the 120 acres on Reservoir Road which had been sold on June 27, 1973, had never been owned by a person named Rosalowski. That the land was in fact sold in June corroborates Leili's statement to the affiants that when he told a friend who was employed in the real estate business that he had bid on the property, his friend laughed and told him that he should get his money back because the property had been sold for about two months. The affidavit adequately divulges the underlying circumstances to show that Leili and Huber were credible and their information reliable.

*Aguilar* v. *Texas,* supra. In addition, the affidavit contains independent corroboration of Leili and Huber's allegations in the form of a phone bill, the copies of the negotiable instruments and the New Milford land records. *Spinelli* v. *United States,* 393 U.S. 410, 89 S. Ct. 584, 21 L. Ed. 2d 637 (1969). Since the facts stated in the affidavit establish probable cause for the warrant to arrest Ballas for larceny, the court did not err in refusing to grant that portion of the defendant's motion to dismiss which was addressed to this claim.

The defendant's attack on the trial court's jurisdiction also alleges error in the procedure by which he waived a hearing in probable cause.[1] According to the defendant, the waiver was involuntary and invalid because it was motivated by fear of further incarceration. The defendant asserts that the attorney who represented him at the bindover proceeding in Circuit Court told him that if he insisted on a hearing in probable cause the prosecutor would seek and most likely be able to obtain an increase in bond, and that on that advice he entered the waiver to avoid returning to jail. A hearing in probable cause is not required by the constitution where there has already been, such as there is here, an independent determination of probable cause by a neutral magistrate. *State* v. *Paluga,* 171 Conn. 586, 591–92, 370 A.2d 1049 (1976); *State* v. *Townsend,* 167 Conn. 539, 552–54, 356 A.2d 125, cert. denied, 423 U.S. 846, 96 S. Ct. 84, 46 L. Ed. 2d 67 (1975); *State* v.

[1] At the time of the defendant's arrest in March, 1975, General Statutes § 54-76a, then effective but now repealed, outlined the procedures for a hearing in probable cause. The statute states in pertinent part: "The defendant shall be called upon to plead in such hearing and if he waives examination, the judge shall forthwith hold him to answer in the appropriate court." The statute expressly provides for a waiver.

*Cobbs,* 164 Conn. 402, 405–406, 324 A.2d 234, cert. denied, 414 U.S. 861, 94 S. Ct. 77, 38 L. Ed. 2d 112 (1973). Here the trial court found, after a hearing in which the defendant's attorney at the bindover proceeding testified, that no threat of a higher bond had been made. The trial court also noted that the defendant did not testify that he feared an increase in bond. The court did not err in finding the waiver voluntary.

The defendant's claim that the trial court erred in refusing to dismiss the information on the ground that the appointment of the state's attorneys by the judges of the Superior Court violates the constitutional doctrine of separation of powers; Conn. Const., art. IV § 12; has been the subject of extensive discussion by this court. *State* v. *McLucas,* 172 Conn. 542, 564, 375 A.2d 1014, cert. denied, 434 U.S. 855, 98 S. Ct. 174, 54 L. Ed. 2d 126 (1977); *State* v. *Moynahan,* 164 Conn. 560, 567–70, 325 A.2d 199, cert. denied, 414 U.S. 976, 94 S. Ct. 291, 38 L. Ed. 2d 219 (1973). The trial court did not err in concluding that these cases were dispositive of the defendant's claim.

The defendant contends that the trial court erred when it refused to set aside the jury's guilty verdict for insufficient evidence. From the evidence presented, the jury could have found the following: In May, 1973, the defendant told Paul Leili and Helmut Huber that he knew of some property in New Milford for sale at an attractive price which would generate a substantial profit to the purchasers, and that he, Ballas, could obtain financing from his friend who was the president of the Palm Beach Savings Bank. Leili and Huber met Ballas on or about May 25, 1973, to view the property and

told Ballas that they would have to obtain bank loans in order to purchase the property. Ballas told them to act quickly because the matter was "urgent" and his bank president friend did not "want too many people to know about this thing." Ballas also told Leili and Huber that the property was owned by the estate of Rosalowski which was tied up in probate proceedings in a Florida court. Ballas told them that to bid on the property would cost them $12,000.

On May 30, 1973, Leili, Huber and Ballas entered into a written agreement to purchase the 120 acres of land on Reservoir Road in New Milford. Huber gave Ballas a personal money order for $5000. The following day, Leili gave Ballas a cashier's check for $7000. The agreement provided that the $12,000 was to accompany their bid to purchase the property, purported to be in probate in the estate of a Florida domiciliary named Rosalowski, and that the bidding was to take place through the Palm Beach Savings Bank in Florida. Ballas told them that if the bid was successful, the bank would provide 100 percent of the financing and the cash advanced would be returned to Leili and Huber. Ballas told Leili that he could not use his own money to finance the deal because his money was all tied up in Florida real estate, but that the bid would have to be submitted in his name because he knew the bank president and this increased the chances of the bid being accepted.

During the two months after the agreement was executed, Leili called Ballas to inquire about progress on the bid but Ballas replied only that he had heard nothing. On July 19, 1973, Huber called the Probate Court in Palm Beach, Florida, to ask if

there had been any progress in the deal. The court informed him that there was no estate of Rosalowski pending there. When he tried to call the Palm Beach Savings Bank, Huber was informed by the local telephone operator that there was no such bank. That night, when Huber confronted Ballas with what he had learned, Ballas told him that he was mistaken; the Probate Court was in West Palm Beach and the bank was the West Palm Beach Savings Bank. When Huber attempted to confirm this information the next day, he discovered that Palm Beach and West Palm Beach share the same Probate Court and that there was no West Palm Beach Savings Bank.

In August, 1973, Ballas met Leili and Huber at Leili's place of business. When they asked Ballas for their money, he became annoyed but agreed to return it. Leili and Huber never heard from Ballas again. Huber tried in vain to contact him almost daily by telephone. One day when Huber saw Ballas driving his car on route 7 in Brookfield he attempted to stop him, but Ballas eluded him by cutting through a parking lot and running a stop sign. Neither Leili nor Huber saw Ballas again until the trial.

At trial the state called an officer of the First Westchester National Bank as a witness. He identified the $7000 check Leili had obtained at the Danbury Bank and Trust Company and the $5000 personal money order payable to Ballas and drawn by Huber on the Putnam County National Bank of Carmel, New York, as the instruments negotiated by his bank's Brewster, New York, branch office on June 1, 1973. On the basis of the transaction numbers he testified that these two instruments were

involved in two consecutive transactions at his bank's branch office on June 1, 1973. The essence of his testimony was that on June 1, 1973, Ballas purchased two bank money orders payable to the Executive Bank of Fort Lauderdale: one for $12,000, the other for $1000, and that according to bank records Ballas had not presented Leili's check and Huber's money order for cash or for deposit. If these items had been presented for cash the teller would have indicated a break-down of the cash paid out on the reverse side of the checks and the bank would have filed a report with the Internal Revenue Service. The instruments showed no cash break-down and no such report had been filed. If the instruments had been deposited in one of Ballas' accounts, the bank records would show that. No record of a deposit appeared. He testified that the only other possible transaction which could have occurred was that Ballas presented the items in exchange for another type of draft such as the $12,000 bank money order payable to the Executive Bank of Fort Lauderdale.

The state also called as witnesses two employees of the Brewster branch office of the First Westchester National Bank. One of the employees, a bank teller, identified Leili's $7000 check and Huber's $5000 money order as those which Ballas had personally presented to her on June 1, 1973, in exchange for a bank check. She recalled that Ballas had come into the bank that day, had asked for a bank money order in the amount of $12,000, and had said that he wanted to pay for it with the $7000 and $5000 items. Ballas told her that he was planning to buy some property in Florida. She, in turn, took the checks to her supervisor for approval. After the transaction had been approved, the teller

issued Ballas a bank money order for $12,000 payable to the Executive Bank of Fort Lauderdale. The teller also testified that at another time that same day Ballas had purchased a second bank money order for $1000 also payable to the Executive Bank of Fort Lauderdale.

The second branch office employee called by the state as a witness was the teller's supervisor who personally signed the bank money orders. She testified that on June 1, 1973, she had approved the issuance by the bank of a $12,000 bank money order in exchange for the $7000 and $5000 items. The supervisor remembered the two checks the bank had received from Ballas because she had to telephone the drawee banks on each item to inquire if stop payment orders had been issued on them. The supervisor told the teller to process the two items and to issue the $12,000 bank money order because Ballas had stated that he was buying property in Florida and that time was of the essence.

The state also called as a witness an employee of the Executive Bank of Fort Lauderdale, Florida. She testified that Ballas had opened a savings account with the bank on June 5, 1973, with an initial deposit of $13,000. This deposit was comprised of two money orders from the Westchester National Bank, one for $12,000 and one for $1000. With this $13,000 deposit as security Ballas borrowed an additional $13,000 from the Executive Bank of Fort Lauderdale two days later, on June 7, 1973.

The essence of Ballas' defense at trial was that he too had been duped by a Thomas Rutledge who purported to be vice president of the trust department at the Palm Beach Savings Bank. Ballas stipulated at trial that at no time was there an estate

of Rosalowski, or any estate which owned the land, or a Palm Beach Savings Bank. But he claimed that he was unaware of those facts when the agreement with Leili and Huber was executed. Ballas testified that he cashed the items endorsed to him by Leili and Huber at his Brewster, New York bank, on June 1, 1973, and paid the cash, including $1000 of his own money, to Rutledge who had promised him a commission in the event that the bid was successful. To support his testimony, Ballas introduced a receipt signed by Rutledge and a copy of their agreement. Despite Leili's and Huber's testimony that Ballas had never mentioned Rutledge while discussing the transaction, Ballas testified that he had been dealing with Rutledge throughout, and that when he had paid Rutledge the $13,000 but had not heard from him on the bid, he, Ballas, went to Florida to look for him. According to Ballas, it was then that he discovered that he too had been duped.

Ballas also testified that on that same day, June 1, 1973, in a separate and unrelated transaction, he returned to the same bank and purchased two bank money orders payable to the Executive Bank of Fort Lauderdale for $12,000 and $1000 each. Ballas did not dispute the state's evidence that the two bank money orders were mailed to the Executive Bank in Fort Lauderdale and deposited in his account. The essence of his defense was that those money orders were purchased entirely with his own cash, taken from his safe on June 1, 1973, after he had given the $13,000 in cash from Leili, Huber and himself to Rutledge. The central issue at trial, as conceded by the defendant's brief, was what Ballas did with the items which were endorsed to him by Leili and Huber: endorse them to Rutledge

along with $1000 of his own money, or use them to purchase the $12,000 bank money order later deposited in his personal account in the Fort Lauderdale bank.

In *State* v. *Saracino,* 178 Conn. 416, 419, 423 A.2d 102 (1979), the court applied the following test to determine whether the evidence is sufficient to sustain the verdict: " 'When a jury verdict is challenged on the ground that the evidence is insufficient to sustain the verdict, the issue is whether the jury could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify the verdict of guilty beyond a reasonable doubt. . . .' Each essential element of the crime charged must be established by such proof . . . and although it is within the province of the jury to draw reasonable, logical inferences from the facts proven, they may not resort to speculation and conjecture." (Citations omitted.) Ballas contends that the jury could not reasonably have concluded that he was guilty of larceny because the officer of the First Westchester National Bank who testified for the state stated that he could not verify, from the bank's two separate encoding systems which would have enabled him to make such a determination, that the bank money orders were issued in exchange for Leili's check and Huber's money order. Ballas argues that the testimony of the bank teller and her supervisor that the money orders were issued in exchange for the items does not constitute proof beyond a reasonable doubt. He also contends that the state failed to prove beyond a reasonable doubt that his misrepresentation of then existing facts, which he later stipulated to as false, was knowingly

made. Under the standard articulated in *State* v. *Saracino,* supra, and the cases cited therein, it cannot be said that the jury could not reasonably have concluded, upon the facts established by the state and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify the verdict. The jury's necessary inferences that Ballas used the instruments he had obtained from Leili and Huber to purchase the bank money orders and that Ballas' misrepresentations to them had been knowingly false were reasonable and logical. Ballas' claim that the evidence was insufficient under *State* v. *Robington,* 137 Conn. 140, 75 A.2d 394 (1950), to prove that he had obtained Leili's and Huber's money by false pretenses is not persuasive because, as the defendant concedes, the jury could have found at least two misrepresentations of past or existing facts in addition to misrepresentation of future events, that is, what he intended to do with the money. The court did not err in refusing to set aside the verdict for insufficient evidence.

The defendant also claims three evidentiary errors by the trial court. Ballas contends that the trial court erred by admitting evidence introduced by the state to show that he made false promises to Leili and Huber because the bill of particulars specified that he obtained their money by false pretenses, and not by false promise. The defendant cites *State* v. *Robington,* supra, 142, to support his contention. The state's evidence of Ballas' representations to the complainants regarding what he planned to do with their money was admissible to show Ballas' intent to deprive Leili and Huber of their property or to appropriate it to himself, a required element of larceny as defined by § 53a-119.

*State* v. *McCarthy,* 179 Conn. 1, 22, 425 A.2d 924 (1979); *State* v. *Brown,* 169 Conn. 692, 701, 364 A.2d 186 (1975); McCormick, Evidence (2d Ed.) §190, pp. 450–51; 1 Wharton, Criminal Evidence (13th Ed. 1972) § 245. The court did not err in admitting the state's evidence of the defendant's representations regarding what he planned to do with the money.

The second evidentiary error claimed by the defendant concerns the trial court's refusal to admit two exhibits for the defense and to permit cross-examination of Leili with regard to the amount he and Huber sought in damages in a civil action against Ballas. The court refused to admit either a copy of a letter written by the complainants' attorney to Ballas requesting him to return their money or a certified copy of the writ, summons and complaint in their civil action against Ballas. Despite the court's ruling which permitted Leili to answer defense counsel's questions showing that he and Huber had instituted civil proceedings against Ballas, Ballas contends that the court denied him the opportunity to attack the credibility of the witnesses and to show their bias. "As a rule, the extent of a cross-examination is within the court's discretion, although it should be liberally allowed. . . . Nonetheless, the court may restrict a cross-examination to evidence which is competent, material, and relevant, and ' "when the examination has been carried as far as will serve to develop the issues involved and aid the search for the truth, we approve of the trial court curtailing the length and the limit of examinations." ' " (Citations omitted.) *State* v. *Reed,* 174 Conn. 287, 299, 386 A.2d 243 (1978). The record shows that the defendant was permitted to impugn the credibility

and explore the bias of the witnesses when the court permitted Leili to testify on cross-examination that a civil action was pending for the return of the money, and Ballas to testify on direct examination that he received the collection letter from their attorney. The court's rulings that the documents and Leili's testimony as to damages were irrelevant and inadmissible were within its discretion. *State v. Mastropetre*, 175 Conn. 512, 521, 400 A.2d 276 (1978); *State v. Reed*, supra, 299.

The last claim of error on the court's evidentiary rulings is that the trial court erred when, during the defendant's cross-examination of the state's witness, an officer of the First Westchester National Bank, the court asked the witness a question which he answered in a manner favorable to the state, then later instructed the jury to disregard both the question and the answer.[2] The defendant contends that the court's question solicited a conclusory

---

[2] The dialogue between the court, the witness and defense counsel was as follows:

"The Court: Let me just ask, because it seems so obvious to me, isn't it likely he was issued the checks that we have already got in evidence? I mean somehow or other did I go off base here or what? It happened at the same time and on the same date at the same branch. Isn't that the likely —

The Witness: Yes, sir.

The Court: —conclusion to be drawn?

The Witness: Yes, it is, sir.

Mr. Jennings: Your Honor, with all due respect, I would object to that question, because it is a significant issue in the case, and I really don't think the likeliness should be prejudged until we have traced it through.

The Court: That doesn't make it so. I'm just asking the witness if that isn't a likely conclusion to be drawn from the evidence. I am just asking that question, and that's what he answered. I'm going to allow it.

Mr. Jennings: Exception, please, Your Honor.

The Court: It may be noted."

answer which invaded the province of the jury and prejudiced their consideration of his case. "Judges in this state are given wide latitude to comment fairly and reasonably upon evidence received at trial, and such comments are not improper merely because they tend to point out strengths, weaknesses, or difficulties of a particular case." *State v. Echols,* 170 Conn. 11, 14, 364 A.2d 225 (1975). Here the trial court instructed the jury to disregard both the question and the answer.[3] In addition, the defendant called the same witness to testify on his behalf seven days after the court questioned him. It was then that the bank officer stated that he could not conclusively determine whether the bank money orders were issued in exchange for the items endorsed to Ballas by Leili and Huber, discrediting his former response to the question asked by the court. Any inferences which may have been drawn

---

[3] The court charged the jury, in part, as follows:

"The Court: Let me say one other thing. In the course of the trial—as I recall on this issue, when Mr. Linemaster, whatever his name was—what was his name?

Mr. Galluzzo: Leinweaver.

The Court: Leinweaver testified at some point fairly early on this issue, *I asked, broke in* to ask Mr. Leinweaver a question, whether or not it was more probable or more likely that Mr. Ballas received the money order payable to the Executive Bank in exchange for the two checks from Leili and Huber based upon the circumstances, and he said it was. *I wanted to tell you at this time to disregard that question and to disregard that answer.* I think there is plenty of other evidence in the case, after I have heard the whole case, for you to decide that issue as to the money without regard to any question I might have asked. *Because of the fact that I asked that question, I don't want it emphasized.* I don't want it relied upon, and *I am telling you to disregard it and put it out of your mind,* my question and my answer. I don't normally ask questions except that once in a while to try to clarify something. *In retrospect* as I looked back at that question and answer, *I shouldn't have asked it. Disregard it.* You will decide the case on the basis of what you heard without regard to my question and answer." (Emphasis added.)

from the trial court's remarks cannot be considered prejudicial error under *State* v. *Echols,* supra.

The defendant's final claim of error attacks the trial court's charge to the jury in three respects. First, the defendant claims error in the trial court's refusal to instruct the jury on misapplication of property in violation of General Statutes § 53a-129[4] as a lesser included offense. Although the defendant requested this instruction in accordance with *State* v. *Whistnant,* 179 Conn. 576, 588, 427 A.2d 414 (1979), he was not entitled to it because it is possible to commit the greater offense, in the manner described in the information or bill of particulars, without having first committed the lesser. *State* v. *Whistnant,* supra. Misapplication of property, as defined by § 53a-129, requires an agreement that the property will be returned to the owner at a future time and an encumbrance of the property without consent of the owner. Neither of these elements is required to commit the offense alleged by the information and bill of particulars in this case. The trial court did not err in denying the defendant's request to charge. The defendant's claim that the court erred in failing to instruct the jury to disregard the state's evidence of his false promises to Leili and Huber is unpersuasive because the state's evidence that Ballas had made false promises to Leili and Huber in the commission of that crime was admissable to prove the specific intent required by § 53a-119.

---

[4] General Statutes § 53a-129 provides in pertinent part: "MIS-APPLICATION OF PROPERTY: CLASS A MISDEMEANOR. (a) A person is guilty of misapplication of property when, knowingly possessing personal property of another pursuant to an agreement that the same will be returned to the owner at a future time, he loans, leases, pledges, pawns or otherwise encumbers such property without the consent of the owner thereof in such manner as to create a risk that the owner will not be able to recover it or will suffer pecuniary loss."

The defendant also claims that the trial court's comments on the evidence biased the jury against him because they reviewed only the state's evidence. "The degree to which reference to the evidence may be necessary lies largely in the discretion of the court." *State* v. *Vincenzo,* 171 Conn. 240, 244, 368 A.2d 219 (1976); *State* v. *Guthridge,* 164 Conn. 145, 153, 318 A.2d 87 (1972), cert. denied, 410 U.S. 988, 93 S. Ct. 1519, 36 L. Ed. 2d 186 (1973). In *State* v. *Vincenzo,* supra, this court approved the practice of the trial court's commenting upon important matters not referred to by counsel in argument, which appears to have been the purpose of the instructions at issue here. The test of a charge is whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. *Tezack* v. *Fishman & Sons, Inc.,* 173 Conn. 183, 186, 377 A.2d 272 (1977). The court's instructions, when considered as a whole, fairly presented the case to the jury.

There is no error.

In this opinion the other judges concurred.