STATE OF CONNECTICUT *v.* H. EARL WATERMAN, JR.
(3267)

DUPONT, C. J., BORDEN and BIELUCH, Js.

Argued January 10—decision released May 13, 1986

*James A. Wade,* with whom were *Sylvia Kemp-Orino* and *Stephen Richards,* for the appellant (defendant).

*John M. Massameno,* assistant state's attorney, with whom were *Kevin T. Kane,* assistant state's attorney, and on the brief, *Austin J. McGuigan,* former chief state's attorney, *Paul E. Murray,* assistant state's attorney, and *Peter Timmons* and *Paul A. Audley,* legal interns, for the appellee (state).

DuPONT, C. J. The defendant was found guilty by a jury of the crime of larceny in the first degree, by defrauding a public community, in violation of General Statutes §§ 53a-122 (a) (4) and 53a-119 (6) (3). He was fined $10,000 and sentenced to a five year prison term, execution suspended, with five years probation. A special condition of the defendant's probation was payment of $38,500 in restitution to the town of Suffield.

In appealing from that judgment of conviction, the defendant's basic claims of error are that the trial court erred: (1) in denying his motions to dismiss based on the state's failure to charge him with a criminal offense; (2) in denying his motions for a new trial and in arrest of judgment because the statutes under which he was charged were applied ex post facto and were unconstitutionally vague; (3) in denying his motion for judgment of acquittal because the evidence was insufficient to support the jury's verdict; (4) in admitting evidence of a business entry in the absence of proof that it was accurate; (5) in denying his motion for a new trial because of the state's use of information obtained from a grand jury proceeding; (6) in admitting testimony to show his consciousness of guilt; (7) in requiring him to

make restitution to the town in the amount of $38,500; and (8) in charging the jury regarding the defendant's interest in the outcome of the proceeding.

From 1977 to January, 1983, the defendant was the first selectman for the town of Suffield, and he also served as the town's superintendent of highways. As superintendent of highways, he was responsible for winter sanding and summer oiling and sanding of town roads. The fraud with which the defendant was charged involved the purchase and delivery of sand in connection with maintaining the roads during the period of time commencing in August, 1982, and continuing to January 18, 1983. The jury could reasonably have found certain facts.

The Dale Trucking Company was a business which the defendant formed with a partner, Dale Adams, in the winter of 1982. The company was formed for the purpose of hauling sand for the town of Suffield from the Westfield Sand and Gravel Company located in Westfield, Massachusetts, to Suffield. It did not engage in any other activity. Dale Adams, who worked on the defendant's farm, had an eighth grade education and could not read or write very well. The defendant handled all of the company's business. Dale Trucking had no office, no secretary and no bank account. The defendant deposited checks made out to the company in his personal bank accounts.

In the summer of 1982, without the requisite approval of Suffield's board of finance, the defendant began buying sand from Westfield Sand and Gravel and hauling it to the town in a truck owned by Dale Trucking. Subsequently, the defendant told the board of finance that Dale Trucking had agreed to lease its truck to the town for the purpose of hauling sand, and the board agreed to furnish a driver and insurance for the truck and to pay for the truck's maintenance. No records were kept to monitor the town's receipt of the sand other than

"trip tickets" received from Westfield Sand and Gravel. These tickets measured the amount of sand taken by noting the difference between the weight of the truck before and after loading. The tickets were received by the driver of the truck who would turn them in to either the town highway department foreman or the defendant after every trip. The Westfield Sand and Gravel tickets were never presented to any other town officials. The defendant did not present them either but, instead, prepared fictitious tickets and received requisition forms from the town for payment to Dale Trucking on the basis of these fictitious tickets. All trip tickets and bills presented to the town for payment were prepared by the defendant who cashed the town's checks payable to Dale Trucking and put the money into his personal accounts.

Between August and December of 1982, the trip tickets of Westfield Sand and Gravel showed that 3765.8 cubic yards of sand were sold to the town of Suffield, and that Westfield Sand and Gravel was paid $11,284.30 by Dale Trucking at $3 per cubic yard. The town's records, which were based on the tickets the defendant prepared, showed, however, that Dale Trucking was paid $58,410 for the delivery of 10,622 cubic yards of sand at $5.50 per cubic yard. The trip tickets prepared by the defendant included dates on which no deliveries were made to the town. There were twenty-six more tickets presented to the town by the defendant than there were deliveries.

At trial, the state claimed that the defendant created Dale Trucking as a sham company to enrich himself at the town's expense. Although the defendant denied that the company was a sham, he admitted that he had created false trip tickets, but asserted that no harm was done since the tickets he prepared corresponded to the amount of sand the town actually received. The defendant did not attempt to justify his unorthodox

manner of bookkeeping, but contended throughout the trial that the town received exactly what it paid for.

I

The defendant's first two claims of error, regarding the adequacy of the information to charge him with a crime, and the validity of the statutes with which he was charged, are interrelated. The defendant was arrested by warrant and charged in a short form information with larceny in the first degree under General Statutes § 53a-122. In accordance with Practice Book § 833, the state filed a substitute information encompassing the specifications of a bill of particulars requested by the defendant. The substitute information, dated January 10, 1983,[1] charged that the defendant, "as an officer and agent of a public community, with intent to prejudice it, [did] present and aid in procuring to be allowed fraudulent claims against the Town of Suffield on behalf of Dale Trucking, totalling in excess of $38,500, in violation of General Statutes §§ 53a-122 (a) (4) and 53a-119 (6)." On March 14, 1984, the day on which the trial was scheduled to begin, the state moved for and was granted permission to file another substitute information which charged the defendant with presenting and aiding in procuring to be allowed fraudulent claims against the town totalling in excess of $2000 in violation of General Statutes (Rev. to 1981) §§ 53a-122 (a) (2) and 53a-119 (6). The defendant moved to dismiss this substitute information on the ground that it did not state an offense on which he could stand trial. The trial court denied this motion. On March 19, 1984, the state was granted permission to file yet another substitute information charging the defendant with violating General Statutes (Rev. to 1981) §§ 53a-122 (a) (2), as amended by Public Acts 1981, No. 81-248, § 1, and 53a-119 (6) (3), as amended

---

[1] This information should have been dated January 10, 1984, the date on which it was filed.

by Public Acts 1981, No. 81-263, § 1, and General Statutes (Rev. to 1983) §§ 53a-122 (a) (4) and 53a-119 (6) (3). This information referred to all of the public acts leading to the 1983 revision of General Statutes § 53a-122. The trial court denied the defendant's oral motion to dismiss that information.

The defendant claims that the trial court erred in denying his motion to dismiss the March 14, 1984 information because the statutes under which he was charged therein, General Statutes (Rev. to 1981) §§ 53a-122 (a) (2) and 53a-119 (6), did not encompass the crime of defrauding a public community. General Statutes (Rev. to 1981) § 53a-122 provided in part: "(a) A person is guilty of larceny in the first degree when . . . (2) the value of the property or service exceeds two thousand dollars." General Statutes (Rev. to 1981) § 53a-119 provided in part: "A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. Larceny includes, but is not limited to . . . (6) Defrauding of public community. Any officer or agent of any public community is guilty of defrauding of public community who, with intent to prejudice it, appropriates its property to the use of any person or draws any order upon its treasury or presents or aids in procuring to be allowed any fraudulent claim against such community. For purposes of this section such order or claim shall be deemed to be property."[2]

---

[2] General Statutes § 53a-119 (6) now provides: "Defrauding of public community. A person is guilty of defrauding a public community who (1) authorizes, certifies, attests or files a claim for benefits or reimbursement from a local, state or federal agency which he knows is false; or (2) knowingly accepts the benefits from a claim he knows is false; or (3) as an officer or agent of any public community, with intent to prejudice it, appropriates its property to the use of any person or draws any order upon its treasury or presents or aids in procuring to be allowed any fraudulent claim against such community. For purposes of this section such order or claim shall be deemed to be property."

The defendant argues that notwithstanding the fact that General Statutes (Rev. to 1981) § 53a-119 (6) defined the crime of defrauding a public community as a form of larceny, the act of defrauding a public community did not become a crime until the passage of Public Acts 1982, No. 82-271, § 1, which took effect on October 1, 1982, and added language to § 53a-122 (a) which specifically referred to defrauding a public community. As amended, the statute provided in part: "A person is guilty of larceny in the first degree when he commits larceny as defined in section 53a-119 and . . . (4) the property is obtained by defrauding a public community, and the value of such property exceeds two thousand dollars." Public Acts 1982, No. 82-271, § 1.[3]

The defendant maintains that because he was charged in the March 14, 1984 information under the law which existed in 1981, his motion to dismiss should have been granted because it failed to charge him with a crime.

"If the information apprises the accused of the charges against him with such particularity and certainty to enable him to prepare his defense and avoid prejudicial surprise, and to enable him to plead his conviction or acquittal in bar of any future prosecution for the same offense, it is constitutionally sufficient." *State v. Ramos*, 176 Conn. 275, 277–78, 407 A.2d 952 (1978). The substitute information of March 14, 1984, charged the defendant not only with the violation of General Statutes (Rev. to 1981) § 53a-122 (a) (2), but also with the violation of § 53a-119 (6). The specific charge of violating § 53a-119 (6) sufficiently apprised the defendant of the state's intention to proceed upon the offense of larceny as described in § 53a-119 (6). See *State v. Ballas*, 180 Conn. 662, 664–65, 433 A.2d 989 (1980).

[3] This statute has undergone no further amendment since 1982.

There is no merit in the defendant's argument that the specific mention of defrauding a public community in the 1982 amendment to General Statutes § 53a-122 implicitly rendered the crime excluded from the 1981 version. This position would require a conclusion that the legislature had no purpose at all when, in the 1981 statute, it defined larceny as encompassing the crime of defrauding a public community in General Statutes § 53a-119.

While it is axiomatic that penal statutes must be strictly construed to protect the fundamental constitutional right to liberty, they must also be construed so that they carry out the intent of the legislature. *State* v. *Belton,* 190 Conn. 496, 505–506, 461 A.2d 973 (1983). This intent is presumed to be that of creating a consistent body of law. *Warner* v. *Leslie-Elliott Constructors, Inc.,* 194 Conn. 129, 134, 479 A.2d 231 (1984). The construction of statutes requires that " 'the application of common sense to the language of a penal law is not to be excluded in a way which would involve absurdity or frustrate the evident design of the lawgiver.' *State* v. *Pastet,* 169 Conn. 13, 21–22, 363 A.2d 41, cert. denied, 423 U.S. 937, 96 S. Ct. 297, 46 L. Ed. 2d 270 (1975)." *State* v. *Belton,* supra, 505–506. When General Statutes § 53a-122, as amended in 1982, is read together with § 53a-119 (6), it is clear that the 1982 amendment to § 53a-122 was not intended to alter existing law as to defrauding a public community, but was merely declaratory of it. See *State* v. *One 1977 Buick Automobile,* 196 Conn 471, 478–79, 493 A.2d 874 (1985). The defendant could not have been misled as to the offense with which he was charged. *State* v. *Ballas,* supra, 664–65.

The defendant also claims that he was prejudiced because the March 14, 1984 information was not filed until jury selection had already begun and consequently he was barred from adequately preparing his defense.

This argument, which is essentially one of denial of due process, is not supported by the record. "The defendant must provide a specific showing of prejudice in order to establish that he was denied the right of due process of law as a result of the state's delay in modifying . . . the information." *State* v. *Ramos,* supra, 279–80. A bare assertion of prejudice is not enough to establish a denial of due process. Id., 280. The defendant, moreover, did not seek a continuance to prepare his defense following the filing of the state's substitute information. See id., 279.

The defendant further contends that by filing the March 19, 1984 information, the state "sub silentio" admitted that the March 14, 1984 information was inadequate. He argues that because the earlier information was inadequate, the trial court did not have jurisdiction over him on March 19, 1984. Since the trial court did not err in denying the defendant's motion to dismiss the March 14, 1984 information, the trial court clearly had jurisdiction over the defendant on March 19, 1984.

"It is an established rule of procedure that, prior to trial, nonsubstantive changes may be made in an [information]." *State* v. *Secore,* 194 Conn. 692, 699, 485 A.2d 1280 (1984); Practice Book § 622.[4] In this case, the substitute information of March 19, 1984, did not add an additional or different offense, nor did it alter a material element of the crime charged. The filing of it did not deprive the defendant of an opportunity to prepare his defense. See *State* v. *Ramos,* supra, 277. The information did nothing more than update the citations to

---

[4] Practice Book § 622 provides: "The judicial authority may order at any time such relief as is required to remedy any defect, imperfection or omission in the indictment, information, or complaint, including the following: (1) Any matter of form; (2) Any miswriting, misspelling, or improper English; (3) Any misuse of a sign, symbol, figure, or abbreviation; or (4) Any omission of the true name or any misspelling of the name of the defendant."

the statutes under which the defendant was charged. This was a purely technical amendment. In the absence of anything more than a technical difference between the two substitute informations and with no showing of prejudice to the defendant, the court did not err in permitting the state to file the substitute information of March 19, 1984.

The defendant's claim that he was charged with and convicted of an ex post facto law must likewise fail because it rests upon the faulty premise that defrauding a public community did not become a crime until October 1, 1982. The crime of defrauding a public community was first enacted as a part of the original penal code, effective October 1, 1971. Public Acts 1969, No. 828, §§ 121 (f) and 215. Its degree of severity for classification as felony or misdemeanor and for permissible punishment was determined by the value of the property or services involved in the larceny. General Statutes §§ 53a-121 through 53a-125. That was the scheme or design created by the penal code for the various forms of larceny defined and prohibited by § 53a-119. The 1982 amendments to § 53a-122 by Public Acts 1982, No. 82-271, § 1, did not create for the first time the crime of defrauding a public community, but merely excluded that crime from the increase in value necessary for the offense of larceny in the first degree.[5]

As we have already noted, the 1982 amendment to General Statutes § 53a-122 was declaratory of existing law. It boggles the mind to conclude that the defendant was unaware that defrauding a public community in an amount in excess of $2000 would subject him to punishment under § 53a-122. See State v. Eason, 192 Conn. 37, 45–46, 470 A.2d 688 (1984).

---

[5] Public Acts 1982, No. 82-271, § 1, increased the value of the property or service from $2000 to $10,000.

The defendant argues additionally that the March 19, 1984 information should have been dismissed, and that his later motion for a new trial and in arrest of judgment should have been granted, because General Statutes § 53a-119 (6) (3) is unconstitutionally vague. He argues that the statute is ambiguous because it could permit a conviction on the basis of a public official's mere presentation of a fraudulent claim when, in fact, the legislature intended that actual prejudice to the community must be proven as a prerequisite for a conviction of the crime of defrauding a public community.

In construing statutes, we look first to the statutory language in ascertaining the intent of the legislature. *State* v. *Ellis,* 197 Conn. 436, 445, 497 A.2d 974 (1985). Unless that language is unclear or ambiguous, we are bound by the plain and ordinary meaning of that language and do not search the history of an enactment for any supposed intention. *Robinson* v. *Unemployment Security Board of Review,* 181 Conn. 1, 6, 434 A.2d 293 (1980).

Nothing in the plain language of § 53a-119 (6) (3) supports the defendant's position that the legislature intended that actual prejudice be proven as a prerequisite for a conviction of the crime of defrauding a public community. General Statutes § 53a-119 (6) (3) sets forth three elements of the offense of defrauding a public community: (1) the defendant must be an officer or agent of a public community; (2) he must appropriate its property to the use of any person or draw any order upon its treasury or present or aid in procuring or allowing a fraudulent claim against such community; and (3) he must do so with intent to prejudice the community. The specificity with which the three elements of defrauding a public community are set forth "connotes the legislative intent to exclude that which is not specifically stated." *State* v. *Kish,* 186 Conn. 757, 765, 443 A.2d 1274 (1982). Under that part of the statute

involving the presentation or aiding in procuring or allowing a fraudulent claim, no actual loss by or prejudice to the town is required. The gravamen of the offense in such a case is the presentation of, or the aiding in the procuring or allowance of, a fraudulent claim. If the legislature had intended that prejudice to the community was a prerequisite to conviction, it would have said so. "It is a general rule of statutory construction that penal statutes are not to be extended by inference or implication." 73 Am. Jur. 2d, Statutes § 297.

The court, furthermore, did not err, as the defendant claims, in failing to instruct the jury that it must find that the town failed to receive any of the sand for which it paid. The information charged the defendant with presenting and aiding in procuring "to be allowed fraudulent claims against the town," with the intent to prejudice it. As we have noted, actual prejudice is not an element of the crime of defrauding a public community as set forth in General Statutes § 53a-119 (6) (3).

## II

The defendant next claims that the evidence did not support the verdict and, therefore, that his motion for judgment of acquittal should have been granted. "Appellate review of such a claim requires us to undertake a two step analysis. 'We first review the evidence presented at the trial, construing it in the light most favorable to sustaining the jury's verdict. We then determine whether, upon the facts thus established and the inferences reasonably drawn therefrom, the jury could reasonably have concluded that the cumulative effect of the evidence established guilt beyond a reasonable doubt.' *State* v. *Sinclair,* 197 Conn. 574, 576, 500 A.2d 539 (1985); *State* v. *Cimino,* 194 Conn. 210, 211, 478 A.2d 1005 (1984)." *State* v. *Brown,* 198 Conn. 348, 352, 503 A.2d 566 (1986). The relevant question as to the second step of the analysis is whether the

essential elements of the crime could have been found beyond a reasonable doubt by *any* rational trier of fact. *State* v. *Amarillo,* 198 Conn. 285, 289, 503 A.2d 146 (1986).

At trial, the defendant admitted that the Dale Trucking Company delivery tickets he created had no relation to actual sand deliveries. He also admitted that he deposited checks in his personal bank accounts which the town paid to Dale Trucking. The actual tickets which Westfield Sand and Gravel supplied disclosed that only 3765.8 cubic yards of sand were sold on the town's account and that Dale Trucking paid $11,284.30 for that sand. The town's records, however, showed that Dale Trucking was paid $58,410 for 10,622 cubic yards of sand. Peter Seidler, who drove the truck which delivered the sand to the town, testified that he delivered only 3765.8 cubic yards of sand to the town. The trip tickets from Westfield Sand and Gravel supported Seidler's testimony.

The defendant presented testimony by a consulting engineer that the town could not possibly have completed the road work which in fact was done between the fall of 1982 and March, 1984, if Dale Trucking had delivered only 3765.8 cubic yards of sand. By the engineer's calculations, during this period the sand used by the town totalled 11,524 cubic yards. On this basis, the defendant argues that the jury could not have found beyond a reasonable doubt that the town received only 3765.8 cubic yards of sand. The engineer conceded that his measurement of sand usage occurred a year after the crime was alleged to have taken place, that his calculations were based on statewide consumption figures, as opposed to Suffield's particular consumption, and that he had no direct knowledge of how much sand was deposited or taken from the Suffield sand pile during the time period involved.

The defendant's argument is fatally flawed because it hinges upon his erroneous perception of the elements of the offense of defrauding a public community, that is, that the state must prove that the public community was, in fact, prejudiced by the defendant's scheme. General Statutes § 53a-119 (6) (3), as we have already noted, does not require that actual prejudice be proven. Even if we assume that prejudice had to be shown, the jury could reasonably have credited the testimony presented by the state and rejected that presented by the defendant. It is the jury's role, not ours, to evaluate conflicting evidence. *State* v. *Spencer,* 198 Conn. 506, 510, 503 A.2d 1165 (1986). We conclude that the jury could reasonably have inferred from the evidence that the defendant presented or aided in procuring or allowing a fraudulent claim against the town and that he did so with intent to prejudice the community. Under the standard of review applied to sufficiency of the evidence claims, we conclude that the evidence in this case "was sufficient to permit the jury to find the essential elements" of the crime charged proved beyond a reasonable doubt. *State* v. *Fernandez,* 198 Conn. 1, 23, 501 A.2d 1195 (1985).

## III

The defendant additionally claims that the trial court erred in admitting into evidence the Westfield Sand and Gravel tickets to show the weights of the trucks entering and leaving its premises. The defendant argues that the tickets should not have been admitted in the absence of a foundation as to the accuracy of Westfield's scale. He does not dispute their admissibility as business records per se, but he contends that the weights recorded on the tickets were not shown to be reliable. He argues that since the figures on the trip tickets would be meaningless if the scale were inaccurate, the state had the burden of demonstrating that the weight notations were accurate before the tickets

were admitted into evidence. He maintains that in the absence of proof of accuracy, the tickets had no probative value.

General Statutes § 52-180 requires that evidence proffered under the business records exception to the hearsay rule satisfy three requirements: "(1) that the record was made in the regular course of business; (2) that it was the regular course of the business to make the writing; and (3) that the writing was made at the time of the transaction or occurrence or within a reasonable time thereafter. General Statutes § 52-180; *Emhart Industries, Inc.* v. *Amalgamated Local Union 376, U.A.W.,* 190 Conn. 371, 383–84, 461 A.2d 422 (1983)." *LaFaive* v. *DiLoreto,* 2 Conn. App. 58, 62–63, 476 A.2d 626, cert. denied, 194 Conn. 801, 477 A.2d 1021 (1984).

In this case, the trial court was presented with evidence that: (1) the scales were tested for accuracy periodically and without prior notice by both the department of weights and measures for the city of Westfield, Massachusetts, and by the Commonwealth of Massachusetts; (2) such testing occurred, and adjustments were made in November, 1978, July, 1978, May, 1979, and July, 1981; (3) Westfield Sand and Gravel, which had been in business since 1973, relied on the readings of the scale in the ordinary course of its business; (4) Westfield's customers relied upon its readings and would have complained of any inaccuracy if there had been any; and (5) there are legitimate explanations for differences in the tire weight of a truck weighed at separate times during the course of a day.

Conformity with the statutory conditions which permit the admission of business records is deemed to provide reasonable indicia of reliability. *American Oil Co.* v. *Valenti,* 179 Conn. 349, 358, 426 A.2d 305 (1979). "Even when properly admitted, [however,] such rec-

ords carry no presumption of accuracy, their credibility remaining a question for the trier of fact. *State* v. *Ward,* 172 Conn. 163, 170, 374 A.2d 168 (1976)." Id. While the circumstances of the making of the trip tickets may be shown to affect the weight of that evidence; see General Statutes § 52-180; *Burkert* v. *Petrol Plus of Naugatuck, Inc.,* 5 Conn. App. 296, 300, 497 A.2d 1027 (1985); there is no requirement that the accuracy of a business record be proved as a prerequisite to its admission.

## IV

The defendant took the stand in his own defense. During direct examination he testified, in support of his claim that he performed his duties as first selectman in an unorthodox manner, that he had caused a collapsed bridge to be rebuilt at a low cost by using his own design. On cross-examination he was asked who had bid on the bridge project. The defendant responded by naming two contractors who had jointly submitted the lowest bid. He was then asked if he had told one of them that their bid would be accepted if they submitted a new bid, increased by $15,000, and would give $10,000 to him. The defendant denied that he had done so. The two contractors subsequently were allowed to testify, during rebuttal by the state, that the defendant had sought a $10,000 "kickback" from them. The contractors had previously testified about the same incident before an investigative grand jury which was inquiring into matters not directly involved in this case. The testimony of the contractors was introduced to impeach the credibility of the defendant. After their direct examination, the defendant was given a transcript of their grand jury testimony in accordance with Practice Book § 752.

The defendant argues that the trial court improperly permitted the state to use this information, because its

use gave the state an unfair advantage over him and tainted the fairness of his trial, since his counsel would not have pursued this line of questioning on direct examination had he been aware of the grand jury testimony.

The defendant also claims that the state improperly used the information because transcripts of testimony before an investigative grand jury were used without the proper authorization required by General Statutes § 54-47 (g), and because the transcripts should have been turned over to his counsel prior to the introduction of any such information. The state argues that these claims should not be reviewed because they were not distinctly raised below, because the trial court never actually ruled upon the defendant's requests that the state disclose when such evidence would be used and whether authorization had been obtained, and because the defendant lacks standing to raise the claim that the transcripts were improperly disclosed. The state also argues that this claim cannot be reviewed because the defendant never established that the evidence presented at trial actually derived from such grand jury testimony.

Although the trial court never ruled upon the defendant's request, counsel for the defendant did tell the court that it was his position that absent permission from the judge presiding over the grand jury investigation, the use of the evidence in the present proceeding was improper. Pursuant to Practice Book § 3063, we need not consider claims not distinctly raised at trial and not arising subsequent thereto. *State* v. *Miller,* 186 Conn. 654, 658, 443 A.2d 906 (1982). Here, however, counsel for the defendant did raise the claim that the grand jury evidence had been improperly obtained and did so with sufficient distinctness to permit our review. The requirement that a claim be properly raised and decided at trial is intended to alert the trial court to

the claim "while there is still an opportunity for correction in order to avoid the economic waste and increased court congestion caused by unnecessary retrials." *State* v. *Packard,* 184 Conn. 258, 281, 439 A.2d 983 (1981). The trial judge was clearly apprised of the issue of the propriety of the release of the information.

Lack of standing, moreover, does not bar the defendant from raising this claim. The interest in the secrecy of grand jury proceedings is more than a public one and is intended to do more than protect the interest of the witnesses who testify. One of the goals advanced by the secrecy which surrounds grand jury proceedings is the protection of an innocent accused from unfounded accusations, and accusations which did not lead to an indictment. *Douglas Oil Co.* v. *Petrol Stops Northwest,* 441 U.S. 211, 218 n.8, 99 S. Ct. 1667, 60 L. Ed. 2d 156 (1979). "The implementation of this principle renders it essential that one threatened with stigmatization by unwarranted disclosure be accorded an opportunity to enforce the confidentiality it is designed to secure (see *Douglas Oil Co.* v. *Petrol Stops Northwest,* [supra, 218 n.8]; cf. *Matter of Hynes* v. *Karassik,* 47 N.Y.2d 659, [393 N.E.2d 1015, 419 N.Y.S.2d 942 (1979)]." *Matter of District Attorney,* 58 N.Y.2d 436, 442–43, 448 N.E.2d 440, 461 N.Y.S.2d 773 (1983). The rule of secrecy, therefore, applies equally to those who give evidence and to those concerning whom the evidence is given. Id. The testimony of the contractors before the investigative grand jury related to an accusation against the defendant for which no arrest was made, and the defendant has standing to attack the revelation of that testimony.

General Statutes § 54-47 (g) provides that "[a]t the conclusion of [an investigative grand jury inquiry] the judge, referee or judges conducting the inquiry shall file with the court a report and the court shall direct

whether, and to what extent, the report shall be made available to the public or to interested parties. Any transcript of testimony taken at the inquiry shall likewise be filed with the court and it shall have the same powers with reference to it as it has with reference to the report; provided any person accused of crime as a result of the inquiry shall have access at all reasonable times to the transcript of his own testimony given by him in such inquiry."

A grand juror, pursuant to General Statutes § 54-47 (g), must file a report with the court, and *that* court, *not* the grand juror conducting the investigation, must decide whether the report or any transcript of testimony should be made available to the public or interested parties. The defendant argued that the transcript should not be released because the judge presiding at the grand jury investigation did not authorize release. It does not appear in this case, whether any court, other than the trial court, released, at any time, portions of the report or transcript. It is clear that the trial court released the transcripts of the contractors' testimony after they had testified. It is not known whether the contractors, in testifying before the grand jury, were ordered to keep their testimony secret. The transcript in this case does reveal, however, that one of the contractors gave the same information about the bridge project to an investigator from the state's attorney's office.

A defendant has no absolute right to inspect investigative grand jury testimony for the purpose of assisting him in preparation of a defense. *In re Investigation of the Grand Juror,* 4 Conn. App. 544, 553, 495 A.2d 1098, cert. granted, 197 Conn. 812, 499 A.2d 59 (1985). The state may use facts elicited in the course of an investigative grand jury in order to formulate an information against a defendant, and may use those facts in the trial arising from the charges contained in

the information, as long as the trial is otherwise independent of the grand jury proceeding, and is fair and impartial. *State* v. *Hayes,* 127 Conn. 543, 578, 18 A.2d 895 (1941). Thus, the trial court did not err in allowing the use of information gathered during the grand jury investigation of matters not directly related to this case in order to impeach the defendant's credibility when the defendant's objection was that the information was obtained without authorization by the grand juror. The secrecy of an investigative grand jury proceeding is inviolate except if a court has ordered otherwise. A court may order otherwise if a particularized need has been shown, such as that the testimony before the grand jury is necessary to impeach a witness, to refresh recollection, to test credibility, or for use in prosecutions for perjury. *State* v. *Hayes,* supra, 580; *In re Investigation of the Grand Juror,* supra. The defendant, of course, has access to his own testimony before an investigative grand jury. General Statutes § 54-47 (g).

Here, authorization was granted by the trial court, the testimony was used to impeach the defendant's credibility, and there is no indication that the witnesses had been sworn to secrecy as to their testimony when they appeared before the investigative grand jury. As far as appears from this record, their testimony at this trial was "fresh" testimony.

The defendant's alternative claim of error concerning the use of the grand jury material is that, if the transcripts were going to come into the trial at all, he should have been provided with them at whatever time the state determined they would be used. The state could not have determined to use them until after the defendant testified on direct examination.

Practice Book § 752 provides: "After a witness called by the state has testified on direct examination at trial,

the judicial authority shall, on motion of the defendant, order the state to produce any statement of the witness in possession of the state or its agents, including state and local law enforcement officers, which statement relates to the subject matter about which the witness has testified." Our rules of practice governing the disclosure of statements in criminal proceedings substantially track the Jencks Act, 18 U.S.C. § 3500 et seq. That act is looked to by our courts in interpreting our rules governing the disclosure of statements. *State* v. *Hinton,* 196 Conn. 289, 300, 493 A.2d 836 (1985).

"The Jencks Act generally requires the government, on motion of a defendant, to produce statements in its possession of witnesses who testify at a trial. The defendant is only *entitled* to the statement after the witness has testified." (Emphasis added.) *United States* v. *Short,* 671 F.2d 178, 185 (6th Cir.), cert. denied, 457 U.S. 1119, 102 S. Ct. 2932, 73 L. Ed. 2d 1332 (1982). When the federal act was amended in 1970 specifically to include transcript of grand jury testimony within the class of statements which may be disclosed, this "amendment did not affect a trial court's discretion to order pretrial disclosure of grand jury testimony. . . . The amendment merely made clear that after a government witness has testified, that witness's grand jury testimony, if any, is included among the 'statements' which the defendant is entitled to have produced. The Jencks Act does not apply to a motion for pretrial disclosure of a grand jury transcript. *United States* v. *Glassman,* 562 F.2d 954, 957 (5th Cir. 1977); *United States* v. *Budzanoski,* 462 F.2d 443, 454 (3d Cir.), cert. denied, 409 U.S. 949, 93 S. Ct. 271, 34 L. Ed. 2d 220 (1972); see 8 Moore's Federal Practice ¶ 6.05 [3] at 6-113 (1981). . . . The discretion of the trial judge and the requirement of a showing of 'particularized need'

still govern motions for pretrial disclosure of grand jury transcripts." *United States* v. *Short,* supra, 186.

The defendant filed a pretrial motion for an order of disclosure and production which included a request for "copies of any written or recorded statements obtained from any witness concerning the allegations made against the defendant whether or not the prosecuting authority intends to call the person making such statement as a witness in its case-in-chief." This request was deferred by the trial judge, *Klaczak, J.,* to "time of trial per P.B." As we have already noted, Practice Book § 752 authorizes the trial judge to order the state to produce a statement by a witness *after* that witness has testified. The defendant made no specific request prior to trial for the grand jury transcripts nor did he make any showing of particularized need which would have justified his access to the materials. *In re Investigation of the Grand Juror,* supra, 555. The defendant was aware early in the trial that the state had transcripts from an investigative grand jury, but never requested them, and the court never had an opportunity to rule upon such a request. See Practice Book § 3063. The broad assertion that earlier disclosure would have assisted the defense is not enough. See *United States* v. *Bruton,* 647 F.2d 818, 824 (8th Cir.), cert. denied, 454 U.S. 868, 102 S. Ct. 333, 70 L. Ed. 2d 170 (1981). The statements about the alleged demand for a "kickback" did not relate to the allegations against the defendant contained in the information and were not used in the state's case-in-chief. They were generated by the defendant's testimony and related to his credibility.

The defendant had no absolute right to obtain investigative grand jury material which would assist him in his defense. *In re Investigation of the Grand Juror,* supra, 553. The statements of the witnesses were not relevant to proof of any element of the crimes with

which the defendant was charged. They became material only when the defendant testified on direct examination, and then were relevant only as to his credibility. The transcript of their prior testimony provided the defendant with an opportunity to check their trial testimony against that prior testimony. He was entitled to it after they had testified, and he received it.

V

The defendant also claims that the trial court erred in admitting testimony to show his consciousness of guilt. The court permitted James and William Wzorek, the owners of Westfield Sand and Gravel, to testify about several discussions they had had, both before and after the arrest of the defendant, with the defendant and Lucian Arrington, a friend of the defendant. The town had purchased sand through Arrington prior to its arrangement with Dale Trucking. William Wzorek testified that Arrington had said, in the defendant's presence, that they were going to be "hung" by the investigation of the Suffield transactions and that they should get their stories straight. Wzorek stated that the defendant said, at the conclusion of the first meeting, that "we get our stories together, we'll take care of you later." James Wzorek testified that at the second meeting the defendant said that "if we get the stories straight you will be taken care of." Both Arrington and the defendant denied that these conversations took place.

The decision to admit the testimony of the Wzorek brothers was made after a voir dire examination of both witnesses, and the court determined that their testimony was entitled to some credibility. The defendant maintains that their testimony was more prejudicial than probative and that William Wzorek's testimony was inconsistent with his prior testimony before the investigative grand jury. The defendant also argues

that the court erred because it refused to allow voir dire examination of Arrington who, the defendant claims, would have testified that it was his idea to bring the defendant to the meeting with the Wzoreks.

The inherent difficulties of the balancing of the probative value of evidence against its prejudicial effect have led our courts to entrust the "resolution of this determination to the sound discretion of the trial court judge." *State* v. *Tucker,* 181 Conn. 406, 416, 435 A.2d 986 (1980). This determination need only be reversed where there is a manifest abuse of discretion or where injustice appears to have been done. Id. "There are situations where the potential prejudicial effect of relevant evidence would suggest its exclusion. These are: (1) where the facts offered may unduly arouse the jury's emotions, hostility or sympathy, (2) where the proof and answering evidence it provokes may create a side issue that will unduly distract the jury from the main issues, (3) where the evidence offered and the counterproof will consume an undue amount of time, and (4) where the defendant, having no reasonable ground to anticipate the evidence, is unfairly surprised and unprepared to meet it. McCormick, Evidence (2d Ed.) § 185, pp. 439–40." *State* v. *DeMatteo,* 186 Conn. 696, 702–703, 443 A.2d 915 (1982).

Evidence which may be prejudicial is not to be confused with that which is merely damaging to the defendant's case. *State* v. *Wilson,* 180 Conn. 481, 490, 429 A.2d 931 (1980). Prejudicial evidence is that evidence which may *unduly* arouse the jury's emotions of prejudice, hostility or sympathy. Id. There can be no doubt that William Wzorek's testimony was damaging. His testimony, however, was not such that it would unduly prejudice the jury against the defendant. The balancing of the probative value against the prejudicial effect of this evidence fell within the bounds of the trial court's discretion.

The defendant also argues that the court erred in refusing to permit a voir dire examination of Arrington. The main thrust of his argument is that Arrington's testimony would have been critical because Arrington would have testified that he invited the defendant to attend the meetings with the Wzoreks. The defendant contends that the inference of consciousness of guilt can exist only if the defendant initiated the contact with the Wzoreks, because only then would there be a manifestation of bad faith.

Undue pressure upon a witness, by bribery or intimidation, falls within the hearsay exception for admissions of a party by conduct. The conduct "must be connected to the party himself . . . by showing that he did the act or authorized it by words or other conduct. Moreover, the circumstances of the act must manifest bad faith." McCormick, Evidence (3d Ed.) § 273, p. 809.

Evidence of undue pressure upon a witness, in the form of intimidation, "is admissible either on the theory that such conduct of the accused is inconsistent with claims of innocence . . . or, on the theory that such conduct exhibits a consciousness of guilt. . . . Where, however, there is no evidence to connect the defendant with such [conduct] . . . [it is] not admissible against him." (Citations omitted.) *State* v. *Sorbo,* 174 Conn. 253, 256, 386 A.2d 221 (1978). If the question of attempted bribery rather than intimidation is raised, evidence connecting the defendant to the conduct is similarly a prerequisite to its admission. This connection was established in the present case. The testimony adduced at trial was that the defendant himself stated that the Wzoreks would be "taken care of" later. There is no requirement, in order to show a manifestation of bad faith, that the defendant initiate the contact with those to whom he uttered the statements.

## VI

The defendant's claim that the trial court erred in ordering that he pay restitution to the town of Suffield was not properly preserved. The defendant made no objection at the time of sentencing nor did he move to correct the sentence at a later time. See Practice Book § 935. "This court reaches the merits of issues not raised below only where the trial court has committed plain error; Practice Book § 3063; where 'a new constitutional right not readily forseeable has arisen between the time of trial and appeal'; *State* v. *Evans,* 165 Conn. 61, 70, 327 A.2d 576 (1973); or where 'the record adequately supports a claim that a litigant has clearly been deprived of a fundamental constitutional right and a fair trial.' Id.; see *State* v. *Preyer,* 198 Conn. 190, 502 A.2d 858 (1985)." *State* v. *Vinal,* 198 Conn. 644, 653, 504 A.2d 1364 (1986). The defendant has not alleged or shown any basis for our review of this claim under the Evans bypass rule and we invoke the power to notice plain error under Practice Book § 3063 "only in extraordinary circumstances 'where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings.' *State* v. *Hinckley,* 198 Conn. 77, 87–88, 502 A.2d 388 (1985)." *State* v. *Vinal,* supra, 654. On the basis of the record before us, we cannot find that the trial court's order of restitution was plain error.[6]

## VII

The defendant's final claim of error is that the trial court improperly instructed the jury that they should consider the interest of the defendant in the outcome

[6] A limited review of this claim, undertaken to assure that no injustice was done to the defendant, indicates that the trial court had a reasonable basis upon which to order restitution in the amount of $38,500. It could have concluded from the evidence that the loss to the town exceeded that amount. See General Statutes § 53a-30 (a) (4).

of the case in weighing the credibility of his testimony, and that the rules of law were made to protect the innocent and not to protect the guilty. The defendant has framed this issue as the court's failure "to charge the jury as requested." Although the defendant's requested instructions appear in the certified trial court file, the defendant has not printed in his brief either the relevant portions of the charge as requested and as given by the court, or any relevant exceptions to the charge as given. See Practice Book § 3060F (d) (1). Even if the issue is read as one in which the trial court simply erred in its instructions, the defendant was still required to include in his brief "a verbatim statement of all relevant portions of the charge and all relevant exceptions to the charge." Practice Book § 3060F (d) (2). This was not done. A review of the transcript, moreover, reveals that the defendant never took exception to the charge as given. As a consequence, "[i]n the absence of plain error or error falling within the constitutional ambit of *State* v. *Evans,* supra, [this challenge is] unreviewable. See Practice Book § 3063." *State* v. *Harman,* 198 Conn. 124, 137, 502 A.2d 381 (1985). Furthermore, it is well settled that a claim of error based on an instruction that the jury should consider the defendant's interest in the outcome of the case when weighing his credibility is "utterly without merit." *State* v. *Roos,* 188 Conn. 644, 645, 452 A.2d 1163 (1982).

There is no error.

In this opinion the other judges concurred.