# STATE OF CONNECTICUT *v.* MELINDA CHANTEA FISHER
## (SC 20559)

Robinson, C. J., and McDonald, D'Auria,
Kahn, Ecker and Keller, Js.

*Syllabus*

Convicted of the crime of assault in the second degree in connection with
an incident in which she attacked the victim, causing her to suffer a
concussion and facial disfigurement, the defendant appealed, claiming,
inter alia, that there was insufficient evidence to support her conviction
on the ground that there was no evidence that she intended to cause

---

shall not be read to a jury or in any other way introduced in evidence by
either party at any time during the trial of the cause of action against any
other joint tortfeasors, nor shall any other agreement not to sue or release
of claim among any plaintiffs or defendants in the action be read or in any
other way introduced to a jury. If the court at the conclusion of the trial
concludes that the verdict is excessive as a matter of law, it shall order a
remittitur and, upon failure of the party so ordered to remit the amount
ordered by the court, it shall set aside the verdict and order a new trial. If
the court concludes that the verdict is inadequate as a matter of law, it shall
order an additur, and upon failure of the party so ordered to add the amount
ordered by the court, it shall set aside the verdict and order a new trial.
*This section shall not prohibit the introduction of such agreement or release
in a trial to the court.*" (Emphasis added.)

As this court observed in *Peck* v. *Jacquemin*, 196 Conn. 53, 491 A.2d 1043
(1985), "[i]t is readily apparent that, in cases tried to the court to which
this statute applies, the legislature intended . . . to permit the introduction
of any such agreement or release" with a joint tortfeasor to "[assist] the
court . . . in arriving at an award of fair and just compensation where
liability is found . . . ." Id., 73; see id. (because "it is assumed that the trial
court will utilize only competent evidence in arriving at its decision and
will disregard that which is incompetent . . . the matter of an agreement
or release is handled under § 52-216a in a trial to the court with no substantive
difference from the way it is handled in a trial to a jury" (citations omitted)).

State *v.* Fisher

the victim serious physical injury. The defendant had been employed as a technology assistant at a school, and the victim was her supervisor. On the day of the incident, the defendant arrived late to work and was informed that the victim had the key to the information technology laboratory. When the defendant located the victim in a hallway, the victim asked her if she just arrived at work and advised her that, if she was having trouble getting to work on time, they could arrange a different schedule for her. The defendant became agitated and, putting her face directly in the victim's face, stated that she was not "going to kill herself" to get to work on time. When the victim told the defendant to "get out of [her] face," the defendant called the victim a "fucking bitch," punched her in the nose, and threw a cup of coffee at her. The victim tried to get away from the defendant, but the defendant pursued her down the hallway and, when the defendant caught up with her, began to scratch and punch the victim, as the victim pleaded with her to stop. When the victim fell to the floor, the defendant grabbed her by the hair and repeatedly slammed her head against a cinder block wall, causing the victim to black out. The defendant then stood over the victim and repeatedly kicked her in the side. Eventually, M, a paramedic who had just dropped off his son at the school, was able to pull the defendant off of the victim, after which the defendant became compliant and cooperative. The victim was subsequently diagnosed by medical personnel with a nondisplaced fracture of the right nasal bone, a concussion, and severe postconcussion syndrome. At trial, the defendant testified that it was never her intention to cause the victim serious physical injury, explaining that, on the day of the incident, she was tired and experiencing considerable physical pain, that, when the victim, with whom she did not get along, confronted her in the hallway about being late, she became enraged, and that she could not recall most of what had transpired during the incident because she had blacked out. *Held*:

1. The evidence was sufficient to support the defendant's conviction of assault in the second degree, as the jury reasonably could have found beyond a reasonable doubt that the defendant had intended to cause the victim to suffer serious physical injury and, acting with such intent, caused her to suffer two such injuries, namely, a concussion and facial disfigurement: there was sufficient circumstantial evidence to support the jury's finding that the defendant had intended to cause the victim to suffer serious physical injury, as the defendant, after expressing anger toward the victim and calling her a "fucking bitch," committed numerous acts that indicated such intent, including punching the victim in the nose, throwing coffee at her, scratching the victim, grabbing the victim by the hair and repeatedly slamming her head against a cinder block wall, and kicking the victim while she was knocked down; moreover, the jury was not required to credit the defendant's testimony that, although she intended to hurt the victim, she did not intend to cause her serious physical injury, and was free to disbelieve the defendant's

State *v.* Fisher

testimony that she did not recall most of what transpired after the assault began because she blacked out or because she was seized by uncontrollable rage.

2. The defendant could not prevail on her claim that the trial court improperly limited defense counsel's cross-examination of the victim regarding her pending civil action against the defendant, which arose out of the same incident that gave rise to the defendant's conviction, and improperly declined to admit into evidence the complaint in that civil action:

a. Contrary to the defendant's claim, the trial court's alleged error was not of constitutional magnitude, as the defendant's right to cross-examination was not unduly restricted under either the federal or state constitution: defense counsel was permitted to question the victim about the fact that she had filed a civil action against the defendant seeking money damages, about the allegations in the civil complaint pertaining to both the assault and her physical injuries, and about any inconsistencies between those allegations and her statements to the police and her testimony at trial; accordingly, the jury was able to appropriately draw inferences relating to the victim's credibility and reliability as a witness, as well as any financial interest that she may have had in the outcome of the case; moreover, there was no merit to the defendant's claim that the alleged error was of constitutional magnitude insofar as the trial court did not permit defense counsel to question the victim about the amount of damages that she sought in her civil action, as this court and the Appellate Court previously have sustained similar limitations on cross-examination regarding civil actions that arose out of the same circumstances that precipitated the criminal charges against the defendants in those cases.

b. The trial court did not abuse its discretion in precluding defense counsel from questioning the victim more extensively about the specific details of the victim's civil action against the defendant, as it reasonably could have determined that allowing defense counsel to probe the victim regarding the specific dollar amount claimed in the civil action and to introduce the complaint itself into evidence could have led to a more extensive inquiry by both parties regarding the basis for the victim's damages claims, thereby opening the door to collateral evidence concerning the victim's claims for past and future medical expenses, lost earnings and earning capacity, pain and suffering, and emotional distress, the latter a subject that the defendant herself sought to preclude the admission of, in her prior motion in limine, due to the prejudicial nature of that evidence; accordingly, the trial court struck an appropriate balance between the defendant's right to cross-examination and her own effort to preclude evidence of the emotional impact of the assault on the victim and her family, and defense counsel's inquiry, taken as a whole, was sufficient to establish the victim's potential interest or financial motive in testifying as she did.

State *v.* Fisher

3. The trial court correctly determined that M, a paramedic with ten years of experience and special training in diagnosing concussions, was qualified to testify as an expert witness regarding signs a paramedic looks for in evaluating a patient for a concussion: the court acted within is discretion in concluding that M had special knowledge suitable to aiding the jury in deciding the issue of whether the victim had sustained a serious physical injury as a result of the defendant's attack on her, and the fact that M did not physically examine the victim did not render his expert testimony inadmissible; moreover, even if the trial court had abused its discretion in admitting M's expert testimony, any error was harmless, as M's testimony was merely cumulative of the testimony of three other expert witnesses.

Argued October 22, 2021—officially released February 10, 2022*

*Procedural History*

Substitute information charging the defendant with two counts of assault in the first degree, one count of attempt to commit assault in the first degree, and three counts of assault in the second degree, brought to the Superior Court in the judicial district of New Britain and tried to the jury before *Oliver, J.*; verdict and judgment of guilty of two counts of assault in the second degree; thereafter, the court conditionally vacated the conviction as to one count of assault in the second degree, and the defendant appealed. *Affirmed.*

*James B. Streeto*, senior assistant public defender, for the appellant (defendant).

*Denise B. Smoker*, senior assistant state's attorney, with whom, on the brief, were *Brian W. Preleski*, state's attorney, and *Ronald Dearstyne*, former senior assistant state's attorney, for the appellee (state).

*Opinion*

KELLER, J. The defendant, Melinda Chantea Fisher, appeals[1] from the judgment of conviction, rendered fol-

* February 10, 2022, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] The defendant appealed to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

State *v.* Fisher

lowing a jury trial, of two counts of assault in the second degree in violation of General Statutes § 53a-60 (a) (1).[2] The defendant claims that (1) there was insufficient evidence to sustain the jury's verdict of guilty of assault in the second degree,[3] (2) the trial court erred in denying the defendant's request to cross-examine the victim more extensively regarding her civil action against the defendant, and (3) the trial court erred in allowing a paramedic, testifying as a fact witness, to testify regarding symptoms of a concussion. We disagree with each of these claims and, accordingly, affirm the judgment of the trial court.

The record reveals the following relevant facts, which the jury reasonably could have found, and procedural history. On April 21, 2016, the defendant had been employed as a technology assistant for the Southington public schools for approximately five weeks. That morning, she was assigned to work at South End Elementary School (school). Although she was supposed to report to work at 8 a.m., she did not arrive until around 8:15 a.m. due to a prior work commitment and because she was experiencing considerable dental pain. Upon arrival,

---

[2] General Statutes § 53a-60 (a) provides in relevant part: "A person is guilty of assault in the second degree when: (1) With intent to cause serious physical injury to another person, the actor causes such injury to such person or to a third person . . . ."

[3] Count four of the operative information alleged that the defendant committed assault in the second degree when, with the intent to cause serious physical injury to another person, she caused the victim to suffer a concussion, and count five alleged that the defendant committed assault in the second degree when, with the intent to cause serious physical injury to another person, she caused the victim's face to be disfigured. The trial court vacated the conviction as to count five pursuant to *State* v. *Polanco*, 308 Conn. 242, 61 A.3d 1084 (2013), "subject to being reinstated should count four be overturned on appeal," and sentenced the defendant on only count four. Nevertheless, the defendant argues that, because count five also required the state to prove that she intended to cause serious physical injury, and because reversal of her conviction on count four would require reinstatement of count five, the sufficiency of the evidence argument applies to both counts.

State *v.* Fisher

the defendant went to the main office to get the key for the information technology laboratory (lab) but was told that her supervisor, Lura Terrace, the victim in this case, had the key. Melanie Krupinski, a second grade teacher at the school, saw the defendant outside the locked lab and offered to let her leave her things in Krupinski's classroom while she looked for the key to the lab. The defendant told Krupinski how angry and upset she was that her "boss"[4] had insisted that she come to work, despite her dental pain. While speaking to Krupinski, the defendant appeared quite angry and stated that "she didn't want to see [the victim's] face."

After leaving Krupinski's classroom, the defendant found the victim in the hallway outside of the gymnasium. The victim asked the defendant if she had just arrived at work and advised her that, if she was having trouble getting to work on time, they could try to figure out a different work schedule for her. At that point, the defendant became "agitated" and, putting her face directly in the victim's face, stated that "she wasn't going to kill herself" to get to work on time. When the victim told the defendant to "get out of [her] face," the defendant responded by calling her a "fucking bitch" and punching her in the nose with her right fist. The defendant, who until this point had been holding a cup of coffee and a laptop in her left hand, threw the laptop to the ground, causing it to break, and then threw the cup of coffee at the victim. The victim tried to get away from the defendant, but the defendant pursued her down the hallway. When the defendant caught up with her, she began punching and scratching the victim,

_____

[4] Krupinski testified that she was not sure who the defendant's boss was at the time. The victim, however, who had worked for the Southington public school district for sixteen years, testified that she supervised only one employee at the time, and that was the defendant. Moreover, the school's principal at the time, Erin Nattrass, testified that the victim was responsible for supervising the school's technology assistants and that, on the date in question, the defendant was the school's technology assistant.

State *v.* Fisher

while the victim pleaded with her to stop. When the victim fell to the floor, the defendant grabbed her by the hair and slammed her head against a cinder block wall, causing the victim to black out. When the victim came to, the defendant was standing over her and repeatedly kicking her in the side.

Erin Nattrass, the school's principal, and Patrick J. Myers, a parent, witnessed the attack. Nattrass testified at trial that she was standing in a classroom doorway talking to a teacher when she saw the defendant pursuing the victim down the hallway. The victim was walking away from the defendant with her hands up, saying things like "[s]top, get away from me," but the defendant kept hitting her in her face, neck, and arms. When the victim fell to the ground, the defendant grabbed her by the hair and slammed her head into the wall at least twice and then started kicking her. Although Nattrass attempted to intervene both verbally and physically, she was unable to stop the assault.

Myers, who was a paramedic, testified that he had just dropped off his son at preschool when he heard the defendant and the victim yelling at one another in the hallway and saw the defendant throw her coffee at the victim. As Myers approached the two women, the defendant threw the victim to the ground and started kicking her. Myers then saw the defendant bang the victim's head into the wall several times. Eventually, Myers was able to pull the defendant off the victim, at which point the defendant became compliant and cooperative.[5] The defendant told Myers that she had done what she had done because "[the victim] was harassing her," "she was very sick and should not have

_____

[5] Myers testified that, as he removed the defendant from the victim, she turned and saw his paramedic uniform, "stopped . . . what she was doing . . . [and became] compliant with [him]." Myers indicated that it "is not uncommon" for this to occur when he is in uniform.

State *v.* Fisher

been at work in the first place,'' and ''she [was] working multiple jobs and [was] extremely tired.''

After the assault, Nattrass helped the victim off the floor and escorted her to the nurse's office. There, Nattrass observed scratches on the victim's neck and chest, and blood on her ear. Nattrass then returned to where the defendant and Myers were waiting and asked them to accompany her to her office, which they did. When the police and paramedics arrived, the defendant was placed under arrest, and the victim, based on her injuries, was transported by ambulance to a hospital.

At the hospital, the victim was treated by Douglas Whipple, the supervising emergency room physician. Whipple's initial triage notes indicated that the victim was ''very shaken up and . . . crying,'' that she had ''generalized achiness and facial discomfort,'' and that she denied loss of consciousness. Whipple ordered a computerized tomography scan to assess if there was bleeding or skull or facial fractures, which came back negative. Whipple nevertheless diagnosed the victim with a nondisplaced fracture of the right nasal bone at the junction with the maxilla and soft tissue swelling in the right infraorbital region. He instructed her to return to the hospital if her headache worsened or if she experienced vomiting or dizziness, all of which are symptoms of a ''delayed bleed'' or concussion. He also recommended that she follow up with a neurologist and not return to work.

That evening, the victim woke up with severe dizziness, vomiting, and a worsened headache. The next day, she visited her primary care physician, Pei Sun, informing Sun of the emergency room visit and about her symptoms, which included vomiting, dizziness, headache, and an inability to concentrate. Sun diagnosed the victim with a brain concussion, nausea, and a nasal fracture. When the victim returned to Sun for a follow-

State *v.* Fisher

up visit on May 3, 2016, she was experiencing nausea, headaches, and new lower back pain, so Sun referred her to Kwame O. Asante, a head injury specialist at Hartford Hospital. The victim saw Asante on May 6, 2016, and, after performing a number of tests on her, including neurological, sensory, and cranial nerve accommodation examinations, Asante diagnosed the victim with severe postconcussion syndrome.

On the basis of the aforementioned events, the defendant was charged with one count of assault in the first degree in violation of General Statutes § 53a-59 (a) (1), one count of attempt to commit assault in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-59 (a) (1), one count of assault in the first degree in violation of § 53a-59 (a) (2), two counts of assault in the second degree in violation of § 53a-60 (a) (1), and one count of assault in the second degree in violation of § 53a-60 (a) (2). A jury trial was held before the trial court. At the conclusion of the state's case-in-chief, the defendant filed motions for a judgment of acquittal as to all five charges, which the court denied.

At trial, the defendant testified in her own defense that it was never her intention to cause the victim serious physical injury. She explained that she was tired and in a great deal of physical pain when she arrived to work on the day in question. She further stated that, although she had been employed by the Southington public school district for only a brief period of time, she and the victim had already been in prior "verbal altercations," during which the victim called her "names" and was "very verbally abusive." The defendant also accused the victim of saying "mean things to other people" about her. The defendant testified that, when she found the victim in the hallway that morning, another verbal altercation ensued, during which the defendant became enraged. The defendant stated that she could not recall all of the details of what transpired

State *v.* Fisher

during the altercation because she "blacked out" but that she was certain it was not her intention to disfigure the victim. Although the defendant admitted to wanting to hurt the victim during the altercation,[6] she denied any recollection of kicking the victim or slamming her head against a wall.

The jury returned a verdict of guilty on the two counts of assault in the second degree in violation of § 53a-60 (a) (1) and not guilty on the remaining counts. On February 1, 2019, the trial court sentenced the defendant to a term of ten years of imprisonment, execution suspended after two and one-half years, and five years of probation. See footnote 3 of this opinion.

On appeal, the defendant claims that (1) there was insufficient evidence to support the jury's verdict of guilty of assault in the second degree, (2) the trial court erred in denying the defendant's request to cross-examine the victim more extensively regarding her civil action against the defendant, and (3) the trial court erred in allowing Myers, a paramedic testifying as a fact witness, to testify regarding symptoms of a concussion.

I

We begin with the defendant's claim that there was insufficient evidence to support the jury's verdict of

---

[6] On cross-examination, the following exchange took place between the prosecutor and the defendant:

"Q. Okay. Did you pursue [the victim] down the hallway when she tried to get away?

"A. Yes.

"Q. Yes, you went after her. Is that correct?

"A. Yes.

"Q. And when you went at her, were you still swinging your arms at her?

"A. Yes.

"Q. You were very angry, yes or no?

"A. At that point, yes.

"Q. Yes. And you wanted to hurt her, did you not? You just punched her in the nose, she was trying to get away, you continued to go at her with your arms swinging at her, so, were you trying to hurt her, yes or no?

"A. Yes."

State *v.* Fisher

guilty of assault in the second degree. See footnote 3 of this opinion. The defendant contends that, although the evidence supported a finding that she caused the victim serious physical injury, there was no evidence— circumstantial or direct—that she *intended* to cause her serious physical injury, as required by § 53a-60 (a) (1). The defendant argues that, in fact, there was uncontroverted direct evidence—the defendant's own testimony—that she did not intend to cause such injury. The state responds that the evidence was more than sufficient to support the defendant's conviction, arguing that "[t]he jury could reasonably have inferred that the defendant intended to cause [the victim] serious physical injury when she punched [the victim] in the face, pushed her to the ground, and repeatedly banged her head into a cinder block wall." We agree with the state.

"When a criminal conviction is reviewed for the sufficiency of the evidence, we apply a well established [two part] test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *James E.*, 327 Conn. 212, 218, 173 A.3d 380 (2017). As we previously have explained, "proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [finder of fact], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [fact finder's] verdict of guilty." (Internal

State *v.* Fisher

quotation marks omitted.) *State* v. *Taupier*, 330 Conn. 149, 187, 193 A.3d 1 (2018), cert. denied, U.S. , 139 S. Ct. 1188, 203 L. Ed. 2d 202 (2019).

To convict the defendant of assault in the second degree under § 53a-60 (a) (1), the state was required to prove that (1) the defendant intended to cause serious physical injury to another person, and (2) acting with such intent, the defendant caused serious physical injury to that person. For purposes of that statute, "serious physical injury" means "physical injury which creates a substantial risk of death, or which causes serious disfigurement, serious impairment of health or serious loss or impairment of the function of any bodily organ . . . ." General Statutes § 53a-3 (4). A person acts with the requisite intent under § 53a-60 (a) (1) when that person's "conscious objective" is to cause serious physical injury. General Statutes § 53a-3 (11). "[T]he state of mind of one accused of a crime is often the most significant and, at the same time, the most elusive element of the crime charged. . . . Because it is practically impossible to know what someone is thinking or intending at any given moment, [in the absence of] an outright declaration of intent, a person's state of mind is usually [proven] by circumstantial evidence . . . ." (Internal quotation marks omitted.) *State* v. *Bonilla*, 317 Conn. 758, 766, 120 A.3d 481 (2015). We previously have explained that a defendant's state of mind may be proven by, for example, "his conduct before, during and after [an assault]" because "[s]uch conduct yields facts and inferences that demonstrate a pattern of behavior and attitude toward the victim by the defendant that is probative of the defendant's mental state." (Internal quotation marks omitted.) *State* v. *Bennett*, 307 Conn. 758, 766, 59 A.3d 221 (2013). Indeed, "[i]ntent may be, and usually is, inferred from the defendant's verbal or physical conduct. . . . Intent may also be inferred from the surrounding circumstances. . . . The

State *v.* Fisher

use of inferences based on circumstantial evidence is necessary because direct evidence of the accused's state of mind is rarely available. . . . Furthermore, it is a permissible, albeit not a necessary or mandatory, inference that a defendant intended the natural consequences of his voluntary conduct.'' (Emphasis omitted; internal quotation marks omitted.) *State* v. *Lamantia*, 336 Conn. 747, 756–57, 250 A.3d 648 (2020).

The defendant concedes that, if the jury credited the medical evidence and testimony indicating that the victim suffered a severe concussion and facial disfigurement as a result of the assault, then it reasonably could have found that the defendant caused serious physical injury to the victim. She contends, however, that the jury could not reasonably have found that she *intended* to cause such injury. Specifically, she contends that, ''[w]hile the evidence shows [that she] and the victim engaged in a fracas, [her] actions were clearly not the result of calculated planning but, rather, a spontaneous outburst of anger and loss of control . . . [that] constitute[s] 'recklessly' causing serious physical injury (assault in the third degree), not intentionally causing it (assault in the second degree).'' In support of this contention, the defendant relies primarily on her own testimony concerning her physical exhaustion and the extreme pain that she was in on the morning in question, factors that she contends combined to provoke ''an extreme reaction'' when the victim, with whom she did not get along, confronted her in the hallway about being late.

Notwithstanding the defendant's contentions, the jury jywas not required to credit her testimony regarding her state of mind on the morning in question. See, e.g., *State* v. *Ayala*, 333 Conn. 225, 237, 215 A.3d 116 (2019) (''[i]t is the exclusive province of the trier of fact to weigh conflicting testimony and [to] make determinations of credibility, crediting some, all or none of any given witness' testimony'' (internal quotation marks

State *v.* Fisher

omitted)). In particular, the jury was not required to
credit her testimony that, although she intended to hurt
the victim, she did not intend to cause her serious physi-
cal injury. The jury also was free to disbelieve the defen-
dant's testimony that she did not recall most of what
transpired after the assault began, either because she
"blacked out" or because she was seized by uncontrolla-
ble rage. Certainly, it is quite likely that the jury did
believe that the defendant flew into an unanticipated
and uncontrolled rage when confronted by the victim.
The fact that the defendant became so enraged, how-
ever, did not preclude a finding that the defendant
intended to inflict serious physical injury on the victim.
To the contrary, uncontrolled rage precedes or gives
rise to many assaults of this nature, with the rage precip-
itating the intent. Our courts previously have held that
evidence of a defendant's anger or rage toward a vic-
tim—which the defendant admitted was significant in
this case—supported the jury's finding that a defendant
intended to inflict serious physical injury on the victim.
See, e.g., *State* v. *Perugini*, 153 Conn. App. 773, 782–83,
107 A.3d 435 (2014) (evidence of intent was sufficient
to support defendant's conviction of assault in second
degree when record reflected that defendant " 'wasn't
happy' " about victim's statements to defendant's fian-
cée, sped to bar where victim was working, threw beer
bottle at wall near victim, slammed victim into table,
punched and choked victim, hit victim with mop handle,
and left without summoning medical assistance), cert.
denied, 315 Conn. 911, 106 A.3d 305 (2015); *State* v.
*Aviles*, 107 Conn. App. 209, 218–19, 944 A.2d 994 (evi-
dence of intent was sufficient to support defendant's
conviction of murder when record reflected that defen-
dant was angry at victim for taking his money and
refusing to give him marijuana, and for swearing at
defendant's girlfriend and slamming door in her face),
cert. denied, 287 Conn. 922, 951 A.2d 570 (2008); *State*

v. *Corona*, 69 Conn. App. 267, 269, 277–79, 794 A.2d 565 (evidence of intent was sufficient to support defendant's conviction of manslaughter in first degree when record reflected that defendant was angry at victim for telling defendant's girlfriend to "shut up," was initial aggressor, approached victim in threatening manner with his hands in fists, knocked victim to ground, kicked and punched victim, and subsequently renewed his attack while victim was unsteady on his feet and not making any effort to struggle or resist attack), cert. denied, 260 Conn. 935, 802 A.2d 88 (2002).

In every such case, it is the role of the jury to determine whether the state has proven beyond a reasonable doubt that the defendant both intended to and did cause serious or deadly physical injury to the victim. Our only task on appeal is to determine whether, on the basis of the record before us, the jury reasonably could have found as it did. See, e.g., *State* v. *Taupier*, supra, 330 Conn. 187. Performing that task here, we conclude that the jury reasonably could have found that, after expressing anger toward the victim and calling her a "fucking bitch," the defendant committed numerous acts that further indicated her intent to cause the victim serious physical injury. Specifically, after she punched the victim in the nose and threw coffee at her, the defendant chased the victim down the hallway, punched and scratched the victim repeatedly, and, most significantly, grabbed the victim by the hair, slammed her head repeatedly into a cinder block wall, and kicked the victim while she was knocked down, all while ignoring the victim's pleas to stop and Nattrass' attempts to intervene. These acts provide sufficient circumstantial evidence to support the jury's finding that the defendant intended the natural consequence of those actions, namely, the victim's two serious physical injuries.

II

The defendant also claims that the trial court erred in limiting defense counsel's cross-examination of the

State *v.* Fisher

victim regarding her pending civil action against the defendant arising out of the same incident and in precluding admission of the complaint in that action. Specifically, the defendant claims that she was prevented from adducing evidence regarding the amount of damages sought in the civil action and the fact that the complaint included claims for pain and suffering and for punitive damages. The defendant contends that the absence of this evidence impaired her ability to demonstrate that the victim had a significant financial motive to exaggerate the extent of her injuries to her treating physicians, who relied on her reported symptoms to diagnose her concussion, and to the jury in her testimony at the criminal trial. Because the issue of whether the victim sustained *serious* physical injury was an essential element in dispute in the case, the defendant contends that the trial court's ruling was not only an abuse of discretion but an error of constitutional magnitude. We disagree.

The following additional facts are relevant to our review of this claim. Prior to trial, the defendant filed a motion in limine to preclude evidence from the victim pertaining to the emotional impact of the assault on her and her family, arguing that such evidence was unduly prejudicial and would outweigh any probative value. The trial court granted the motion in part, agreeing with the defendant that testimony relating to the emotional impact of the assault would be unduly prejudicial but clarifying that it would still allow testimony from the victim and her husband relating to the impact of the victim's injuries on her ability to do certain things because such evidence was relevant and "an essential element . . . in dispute."

After trial began, and before the victim took the witness stand, the prosecutor sought a ruling from the trial court precluding the defendant from cross-examining the victim regarding a civil action she had filed against

State *v.* Fisher

the defendant pertaining to the same incident underlying the criminal case, or at least limiting the inquiry to the sole question of whether there was a civil action pending. Defense counsel argued that he should be permitted to expose any inconsistencies between the statements made in the victim's civil complaint and other statements made in connection with the criminal proceedings, that the civil action was a proper basis for cross-examination with respect to bias, and that the complaint itself should be allowed into evidence as a "judicial pleading."[7] The court agreed with defense counsel that the existence of the civil action was a proper subject for cross-examination, as it would tend to expose any potential bias;[8] however, it reserved judgment on specific questions until they arose.

During the victim's ensuing testimony, she admitted on cross-examination that she had filed a civil action against the defendant and had hired an attorney to represent her in that action. Defense counsel thereafter

_____

[7] The defendant also asserts that the trial court erred in failing to take "judicial notice" of the civil complaint but provides no analysis of that issue independent of her claim that the court improperly precluded admission of the complaint. Accordingly, we view the former to be subsumed in the latter.

[8] At trial, the trial court and the parties used the terms "bias" and "interest" interchangeably to refer to the victim's alleged motivation to exaggerate her injuries during her testimony in this case. The parties also use the terms interchangeably in their briefs to this court in referring to the victim's alleged motive to testify falsely regarding the extent of her injuries. Although the terms have been used interchangeably, we note that they have slightly different meanings and that, in the present context, any motivation the victim may have had to exaggerate her testimony or to testify falsely for financial gain would, in our view, be indicative of her *interest*, not her bias. See Conn. Code Evid. § 6-5 ("[t]he credibility of a witness may be impeached by evidence showing bias for, prejudice against, or interest in any person or matter that might cause the witness to testify falsely); Conn. Code Evid. § 6-5, commentary ("[a] witness may be biased by having a friendly feeling toward a person or by favoring a certain position based [on] a familial or employment relationship . . . [or a] witness may have an interest in the outcome of the case independent of any bias or prejudice when, for example, he or she has a financial stake in its outcome" (citations omitted)).

State *v.* Fisher

asked the court to take judicial notice of the complaint filed in that action. The prosecutor objected, and the court excused the jury to hear argument on the issue. Defense counsel argued that the entirety of the civil complaint should be made an exhibit because it was a proper area of cross-examination as to bias and it also contained some inconsistent statements. He further argued that the specific fact that the victim was seeking damages from the defendant in excess of $15,000 was relevant because it demonstrated the victim's bias in the form of a financial interest. Defense counsel asserted that "the jury has the right to know that there is a [civil action] pending in this case, that [the victim] is suing [the defendant] for a large sum of money, and that she has an interest in her testimony today showing that her injuries are quite significant because she has a financial interest in that with regard to a civil [action]." In response, the prosecutor acknowledged that the court could allow the defendant to ask some follow-up questions regarding the action but contended that it would not be appropriate to question the victim extensively about it or to enter the complaint itself into evidence. The prosecutor pointed out that, because the complaint asserted a claim for intentional infliction of emotional distress, its admission would conflict with the court's earlier ruling granting the defendant's motion in limine to preclude testimony regarding the emotional impact of the assault on the victim and her family on the ground that such evidence would be unduly prejudicial.

The trial court then ruled that defense counsel could ask the victim certain questions regarding the contents of the civil complaint but that it would not allow the complaint itself to come into evidence. Specifically, the court permitted defense counsel to ask the victim about (1) the fact that she filed a civil action against the defendant for money damages, (2) allegations in the complaint pertaining to both the assault and the victim's

State *v.* Fisher

injuries, and (3) any inconsistencies between her testimony at the criminal trial, her statements to the police, and the allegations in her civil complaint. The court made clear, however, that defense counsel could inquire only about the claim for money damages, not the fact that the victim was seeking compensatory and punitive damages in excess of $15,000. The court further cautioned that defense counsel could address the allegations of pain and suffering but that doing so would "open the door" to matters that the court had precluded in its ruling on the defendant's motion in limine.

When the victim returned to the witness stand, she again acknowledged that she had filed a civil action against the defendant seeking money damages. She acknowledged that the complaint alleged that she lost consciousness and sustained scars on her face and lips, and that the defendant threw hot coffee on her face and body. The victim further admitted that, although she believed that she told the police that she thought she had lost consciousness or blacked out during the incident, no such statement was reflected in her written statement to the police. In closing argument, defense counsel conceded that the victim had been injured but argued that there was a reasonable doubt that the head injury she sustained resulted in a condition sufficient to support the criminal charges, given her financial interest in the civil action and the fact that the severity of her symptoms "seem[ed] to increase over time
. . . ."

Our analysis of the defendant's claim is guided by the following well settled legal principles. "[A] defendant has the right to confront witnesses against him as guaranteed by the confrontation clauses of both our federal and state constitutions." (Internal quotation marks omitted.) *State* v. *Cecil J.*, 291 Conn. 813, 821, 970 A.2d 710 (2009); see also U.S. Const., amends. VI and XIV; Conn. Const., art. I, § 8. "Cross-examination

State *v.* Fisher

[to elicit facts tending to show] motive, bias, interest and prejudice is a matter of right and may not be *unduly* restricted.'' (Emphasis added.) *State* v. *Milum*, 197 Conn. 602, 609, 500 A.2d 555 (1985). Notwithstanding this important right, however, ''the right to confront and to cross-examine is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.'' (Internal quotation marks omitted.) *State* v. *Cecil J.*, supra, 822. ''[T]rial judges retain wide latitude insofar as the [c]onfrontation [c]lause is concerned to impose reasonable limits on . . . cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant. . . . [T]he [c]onfrontation [c]lause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'' (Internal quotation marks omitted.) *State* v. *Bermudez*, 341 Conn. 233, 271, A.3d (2021).

In reviewing claims of this nature, ''[t]he general rule is that restrictions on the scope of cross-examination are within the sound discretion of the trial judge . . . but this discretion comes into play only after the defendant has been permitted cross-examination sufficient to satisfy the sixth amendment. . . . The constitutional standard is met when defense counsel is permitted to expose to the jury the facts from which [the] jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness. . . . Therefore, a claim that the trial court unduly restricted cross-examination generally involves a two-pronged analysis: whether the aforementioned constitutional standard has been met, and, if so, whether the court nonetheless abused its discretion . . . in which case, in order to prevail on appeal, the

defendant must show that the restrictions imposed [on] the cross-examination were clearly prejudicial.'' (Citations omitted; internal quotation marks omitted.) *State* v. *Clark*, 260 Conn. 813, 826–27, 801 A.2d 718 (2002). Specifically, in determining whether a restriction on cross-examination violates the constitutional protection of the confrontation clause, we look at a number of factors, including ''the nature of the excluded inquiry, whether the field of inquiry was adequately covered by other questions that were allowed, and the overall quality of the cross-examination viewed in relation to the issues actually litigated at trial.'' (Internal quotation marks omitted.) Id., 828. If this constitutional standard has been met, the defendant must, in order to prevail on appeal, ''show that the restrictions imposed by the trial court were harmful. . . . In order to do so, the defendant must establish that the impropriety was so prejudicial as to undermine confidence in the fairness of the verdict . . . .'' (Citation omitted; internal quotation marks omitted.) Id., 830. Alternatively, if the constitutional standard is not met, and ''an [evidentiary] impropriety is of constitutional proportions, the state bears the burden of proving that the error was harmless beyond a reasonable doubt.'' (Internal quotation marks omitted.) *State* v. *Edwards*, 334 Conn. 688, 706, 224 A.3d 504 (2020).

A

As a general rule, ''cross-examination of the prosecuting witness should be allowed to show the pendency, existence and status of [a] civil action . . . arising out of the same set of circumstances as those [that] served as the basis for the criminal prosecution.'' (Internal quotation marks omitted.) *State* v. *Milum*, supra, 197 Conn. 610; see *State* v. *Arline*, 223 Conn. 52, 61, 612 A.2d 755 (1992); see also *State* v. *Colton*, 227 Conn. 231, 250–51, 630 A.2d 577 (1993). Such evidence provides the jury with ''significant information to aid in assessing

State *v.* Fisher

the bias, motive, interest and prejudice of the victim for testifying as she did.'' *State* v. *Milum*, supra, 609.

In the present case, defense counsel was permitted to adduce not only all of this essential information but also to probe the particulars of the allegations made in the pending civil action as to the victim's claims concerning physical injuries, all of which were probative of the credibility and reliability of the victim's testimony. See *State* v. *Clark*, supra, 260 Conn. 827. Defense counsel, through cross-examination, was allowed to question the victim to establish that the victim's civil action sought money damages for her alleged injuries. He was also permitted to ask the victim about the allegations in her complaint and any inconsistencies between those allegations and her statements regarding the incident to the police and in court. On the basis of these facts, and taking into account all relevant considerations; see id., 828; we cannot conclude that the defendant's right to cross-examination was unduly restricted under either the United States constitution or the Connecticut constitution. From the inquiries allowed, it is clear that the jury was able to appropriately draw inferences relating to the victim's credibility and reliability as a witness, as well as any financial interest she may have had in the outcome of the case.

Conceding that ''[t]his case does not involve a complete bar of evidence concerning the civil [action],'' the defendant nevertheless argues that the claimed error is of constitutional magnitude because the trial court ''declined to allow the defense to question the victim concerning the *amount* of damages sought . . . .'' (Emphasis added.) In particular, the defendant contends that the scope of examination permitted defense counsel to inquire into the civil action as evidence of the victim's bias or animosity toward the defendant, but not as evidence of the victim's financial motivation

State *v.* Fisher

for portraying her symptoms as severely as possible. We are not persuaded.

Our appellate courts previously have sustained similar limitations on cross-examination regarding civil actions that arose out of the same circumstances that precipitated the criminal case against the defendant. In *State* v. *Ballas*, 180 Conn. 662, 433 A.2d 989 (1980), this court held that the defendant was adequately "permitted to impugn the credibility and [to] explore the bias of the [prosecuting] witnesses when the [trial] court permitted [one of them] to testify on cross-examination that a civil action was pending"; id., 676–77; despite the trial court's refusal to permit cross-examination of him with regard to the specific amount sought in damages in the civil action against the defendant. Id., 676. In *State* v. *Reis*, 33 Conn. App. 521, 636 A.2d 872, cert. denied, 229 Conn. 901, 640 A.2d 118 (1994), the Appellate Court deemed cross-examination constitutionally adequate when the trial court permitted the defendant to cross-examine the victim regarding the fact that the victim had retained a lawyer to bring an action against the defendant "to get his [medical] bills paid and to be compensated for his pain and suffering," but did not allow the defendant "to expose the extent of [the victim's] pecuniary interest by cross-examination concerning the amount of damages [he] was seeking." Id., 524. The Appellate Court determined that the limitation did not violate the defendant's constitutional rights because "the issue of the victim's [interest] arising from his civil [action] against the defendant was adequately covered by other questions allowed by the [trial] court." Id., 526.

The defendant attempts to distinguish *Reis* and *Ballas* by arguing that evidence of the civil actions in those cases was only relevant to show bias against the defendants, not to show a financial interest, in part because the extent of the victims' injuries was not in dispute. We disagree. This court previously has acknowledged

State *v.* Fisher

that ''[a] pending civil [action], or even a contemplated [action], arising out of the same incident that gave rise to the criminal charges is *almost always* relevant to the credibility of a prosecuting witness because it gives her a financial interest in the outcome of the criminal prosecution. Such evidence has great probative value because it shows that the state's prosecuting witness may have been actuated by personal considerations instead of [by] altruistic interest generated solely from motives in the public interest to bring a criminal to justice.'' (Emphasis added; internal quotation marks omitted.) *State* v. *Milum*, supra, 197 Conn. 611–12. That the extent of the prosecuting witness' injuries was not a contested issue in *Reis* and *Ballas* was not, in our view, outcome determinative for the courts in deciding these cases. Rather, the courts in both cases considered the defendants to have had a right to cross-examine the witnesses regarding financial interest, which they adequately were permitted to do, just as the defendant was adequately able to do in the present case.

The defendant also argues that, ''to the degree that this court should hold that [*Reis* or *Ballas*] stands for the proposition that the admission of a complaint or an inquiry into the exact amount or type of damages sought in a civil [action] is always precluded, the defendant would respectfully request that that case be overruled.'' We do not read either case to stand for any such proposition. Rather, in each case, the court merely concluded that the cross-examination permitted was constitutionally sufficient in light of the circumstances of the case. See *State* v. *Ballas*, supra, 180 Conn. 676–77; *State* v. *Reis*, supra, 33 Conn. App. 524–26. It could very well be that, in certain circumstances and cases to come, the allegations in a civil complaint regarding the nature, extent, or amount of damages, or other allegations, could be sufficiently extreme, incongruous, or inconsistent that it would be an abuse of discretion

State *v.* Fisher

or an error of constitutional magnitude not to permit cross-examination as to those issues. This simply is not such a case.

The defendant also cites three cases for the proposition that the right to confront prosecuting witnesses includes the right to put into evidence the amount of damages sought in the civil action or the complaint. In none of these cases did the court conclude that excluding evidence of the amount of damages was itself reversible error, and, in two of the cases, the defendant was not permitted *any* cross-examination on the subject of the victim's pending action. See *United States* v. *Cohen*, 163 F.2d 667, 668–69 (3d Cir. 1947); *Maslin* v. *State*, 124 Md. App. 535, 541–42, 723 A.2d 490, cert. denied, 354 Md. 115, 729 A.2d 406 (1999). The third case, *State* v. *Murdick*, 23 Conn. App. 692, 583 A.2d 1318, cert. denied, 217 Conn. 809, 585 A.2d 1233 (1991), is entirely distinguishable. In that case, the Appellate Court concluded that there was no abuse of discretion in allowing evidence of a civil action—filed before the conduct that led to the criminal charges and not arising out of the same circumstances as the criminal case—to be introduced because "[e]vidence of motive is a highly relevant factor for assessing the guilt or innocence of a defendant." Id., 696. Because the civil action did not arise from the same circumstances as the criminal proceedings, and because the evidence was admitted to show the defendant's motive for *committing the crime*, not the victim's motive to lie or exaggerate injuries for financial gain, we find *Murdick* wholly inapposite.

Finally, the defendant cites *State* v. *Tiernan*, 941 A.2d 129 (R.I. 2008), for the proposition that other jurisdictions "have acknowledged that a financial interest will justify an inquiry into the details, including the amount at issue, in the civil [action]." In that case, however, the trial court had allowed defense counsel to ask only a single question regarding the victim's action against

State *v.* Fisher

the defendant, namely, "whether or not he had filed or intended to file a civil [action] as a result of the events that occurred . . . ." Id., 132. On appeal, the Rhode Island Supreme Court held that "the scope of cross-examination that the trial [court] allowed—just one question—was so limited as to be insufficient under both the [s]ixth [a]mendment to the United States [c]onstitution and [the confrontation clause] of the Rhode Island [c]onstitution. A defendant in a situation such as this must be provided as a matter of right the opportunity to engage in not just some minimal cross-examination, but rather sufficient cross-examination." (Emphasis omitted; footnote omitted.) Id., 137. In the present case, however, as we explained, the defendant was not limited to a single question about the existence of the civil action but, rather, was permitted to ask the victim a number of questions regarding the action, as well as to probe her for any inconsistencies between her testimony and her civil complaint. Therefore, *Tiernan* is inapposite.

B

Having determined that the trial court's exclusion of the evidence was not of constitutional proportions, we must now determine whether the trial court nevertheless abused its discretion by precluding defense counsel from questioning the victim more extensively regarding her civil action against the defendant. We conclude that the trial court did not.

Section 6-5 of the Connecticut Code of Evidence provides that "[t]he credibility of a witness may be impeached by evidence showing bias for, prejudice against, or interest in any person or matter that might cause the witness to testify falsely." The commentary to § 6-5, however, further provides in relevant part that, "[w]hile a party's inquiry into facts tending to establish a witness' bias, prejudice or interest is generally a matter of right, the

State *v.* Fisher

scope of examination and extent of proof on these matters are subject to judicial discretion. . . .'' Conn. Code Evid. § 6-5, commentary. It is well established that ''otherwise [r]elevant evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice or surprise, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence.'' (Emphasis omitted; internal quotation marks omitted.) *State* v. *Brown*, 273 Conn. 330, 342, 869 A.2d 1224 (2005).

We conclude that the trial court did not abuse its discretion by precluding defense counsel from questioning the victim more extensively about the specific details of her pending civil action against the defendant. As we explained, our trial courts have wide discretion in limiting a defendant's cross-examination, as long as the defendant has been permitted sufficient cross-examination to satisfy constitutional requirements. See, e.g., *State* v. *Clark*, supra, 260 Conn. 826. Here, we cannot say that the trial court abused its discretion in restricting the scope of defense counsel's cross-examination of the victim. The trial court, acting under the specific circumstances present in this case, reasonably could have determined that allowing defense counsel to probe the victim regarding the specific dollar amount claimed in the civil action[9] and to introduce the complaint itself into evidence could have led to a more extensive inquiry by both parties regarding the basis for the victim's damages claims, thereby opening the door to collateral evidence concerning the claims in the action for, inter alia, past and future medical expenses, lost earnings and earning capacity, pain and suffering,

---

[9] We note that the amount claimed in the civil action—$15,000 or more— merely conformed to the jurisdictional pleading requirements set forth in General Statutes § 52-91, and, therefore, there is no indication that the victim was seeking a particular amount of money.

State *v.* Fisher

and emotional distress—the latter a subject the defendant herself sought to preclude in her motion in limine due to the prejudicial nature of that evidence. In light of the foregoing, we conclude that the trial court, in limiting defense counsel's inquiry into the particulars of the victim's civil action, struck an appropriate balance between the defendant's right to cross-examination and her own effort to exclude evidence of the emotional impact of the assault on the victim and her family. In sum, and as we previously explained, defense counsel's inquiry, taken as a whole, was sufficient to show the victim's potential interest or financial motive in testifying as she did.

III

Finally, we turn to the defendant's claim that the trial court erred in allowing Myers, a paramedic testifying as a fact witness, to testify concerning the signs a paramedic looks for in determining whether a patient might have a concussion. The defendant contends that, because Myers did not personally examine the victim following the assault, he should not have been permitted to testify in his capacity as a paramedic regarding the general symptoms of a concussion.[10] We find no merit in this contention.

---

[10] The defendant also appears to argue that Myers could not properly have testified as both a fact witness and an expert witness. To the extent that this is the defendant's contention, it is wholly lacking in merit. See, e.g., *State* v. *Tomlinson*, 340 Conn. 533, 553 n.7, 264 A.3d 950 (2021) (noting that expert witnesses often testify in dual capacity as both expert and fact witness); see also, e.g., *State* v. *Dawson*, 340 Conn. 136, 141 nn.7 and 8, 263 A.3d 779 (2021) (police officer who testified as fact witness regarding what he observed also testified as expert on criminal behavior generally); *State* v. *Collins*, 206 Conn. App. 438, 443–44, 260 A.3d 507 (police officer who testified as fact witness regarding his execution of search warrant also testified as expert witness about items that crack cocaine and heroin dealers usually have in their homes), cert. denied, 339 Conn. 914, 262 A.3d 135 (2021). Moreover, § 7-2 of the Connecticut Code of Evidence does not "require an explicit offer and acceptance of a witness as an expert in order for the witness to be treated as an expert witness"; *Nicholson* v. *Commissioner of Correction*, 186 Conn. App. 398, 421, 199 A.3d 573 (2018), cert. denied, 330

State *v.* Fisher

The following additional facts are relevant to our review of this claim. Prior to Myers' taking the witness stand, the trial court indicated that it understood that Myers might testify regarding not only what he had witnessed, but also about concussion symptoms as they relate to his duties as a paramedic. The court further stated that, before any such questions were asked, the prosecutor must lay the factual foundation for Myers' expert testimony, at which time the court would take up any objection from the defense.

After his initial testimony regarding his observation of the altercation, Myers testified on direct examination that he had been employed in emergency medical services for fourteen years, the first four as an emergency medical technician (EMT) and the last ten as a paramedic. Myers testified that a paramedic has much more training than an EMT. To become an EMT, he had to undergo a six month training program. Then, he had to respond to a certain number of calls as an EMT before he could apply to paramedic school. Once accepted into paramedic school, he underwent a one year long

Conn. 961, 199 A.3d 19, cert. denied sub nom. *Nicholson* v. *Cook*, U.S. , 140 S. Ct. 70, 205 L. Ed. 2d 76 (2019); and, therefore, the trial court did not err in treating Myers as an expert witness—notwithstanding the fact that he was originally testifying as a fact witness—once his qualifications were established on the record. We note, finally, that the defendant does not claim that the state failed to provide her adequate *notice* of its intent to call Myers as an expert witness. Pursuant to Practice Book § 40-11 (a) (3), upon written request by the defendant, the state is required to disclose "[a]ny reports or statements of experts made in connection with the offense charged including results of . . . scientific tests, experiments or comparisons which are material to the preparation of the defense or are intended for use by the prosecuting authority as evidence in chief at the trial . . . ." See also *State* v. *Jackson*, 334 Conn. 793, 812, 224 A.3d 886 (2020) (it was abuse of discretion for trial court to allow state's late disclosed expert witness to testify without first granting defendant reasonable continuance to obtain his own expert). The record before us discloses that the defendant did not file any written discovery request under Practice Book § 40-11 (a) (3) for the reports or statements of the state's experts; nor did she raise an issue of lack of notice before the trial court or anytime thereafter.

State *v.* Fisher

program, which included "in excess of 200 hours" of clinical rotations at Saint Francis Hospital and Medical Center. Myers further testified that, as part of his continuing medical education, he was required to complete thirty-six hours of training each year and that he had to maintain certifications in cardiopulmonary resuscitation, advanced cardiovascular life support, and pediatric advanced life support. Myers then testified that, in responding to calls involving motor vehicle accidents or falls, he deals with the possibility of concussions on "a regular basis." He also indicated that, during paramedic school, he was trained in the signs and symptoms of concussions.

At this point, the prosecutor asked Myers what signs he would look for if he were to respond to a scene where the patient may have suffered a concussion. Defense counsel objected to the line of questioning, arguing that Myers was not "in a position to opine on the symptoms and diagnoses of a concussion." The prosecutor, in response, argued that he was not attempting to ask Myers whether the victim sustained a concussion, but, rather, he only intended to ask him about concussion symptoms generally. The court overruled defense counsel's objection and allowed Myers to continue testifying.

Myers then testified that, although the signs and symptoms vary, typically, someone with a concussion would experience nausea, headache, and dizziness. He also testified that there can be other symptoms in addition to those and that symptoms can sometimes manifest later on instead of immediately. Finally, Myers testified that he did not assess or treat the victim in any way on the day in question. He did not opine as to whether the victim sustained a concussion or exhibited any symptoms of one. He stated that, in fact, he did not "notice anything about the victim at all physically" and had no contact with her after separating her from the defendant.

State *v.* Fisher

"We review a trial court's decision to preclude [or admit] expert testimony for an abuse of discretion. . . . We afford our trial courts wide discretion in determining whether to admit expert testimony and, unless the trial court's decision is unreasonable, made on untenable grounds . . . or involves a clear misconception of the law, we will not disturb its decision. . . . Even [i]f we determine that a court acted improperly with respect to the admissibility of expert testimony, we will reverse the trial court's judgment and grant a new trial only if the impropriety was harmful to the appealing party. . . .

"The standards for admitting expert testimony are well established. Expert testimony should be admitted when: (1) the witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues. . . . [T]o render an expert opinion the witness must be qualified to do so and there must be a factual basis for the opinion. . . . [See] Conn. Code Evid. § 7-2 ([a] witness qualified as an expert by knowledge, skill, experience, training, education or otherwise may testify in the form of an opinion or otherwise concerning scientific, technical or other specialized knowledge, if the testimony will assist the trier of fact in understanding the evidence or determining a fact in issue)." (Citations omitted; internal quotation marks omitted.) *State* v. *Williams*, 317 Conn. 691, 701–702, 119 A.3d 1194 (2015). "[T]he true test of the admissibility of [expert] testimony is not whether the subject matter is common or uncommon, or whether many persons or few have some knowledge of the matter; but it is whether the witnesses offered as experts have any peculiar knowledge or experience, not common to the world, which renders their opinions founded on such knowledge or experience any aid to the court or the jury in determining the questions at issue. . . .

State *v.* Fisher

Implicit in this standard is the requirement . . . that the expert's knowledge or experience . . . be directly applicable to the matter specifically in issue.'' (Internal quotation marks omitted.) *State* v. *Guilbert*, 306 Conn. 218, 230, 49 A.3d 705 (2012).

Applying these principles to the present case, we have no difficulty concluding that the trial court correctly determined that Myers, a paramedic with ten years of experience and special training in diagnosing concussions, was qualified to testify as an expert witness regarding signs a paramedic looks for in evaluating a patient for a concussion. We cannot perceive, and the defendant does not explain, why the fact that Myers did not physically examine the victim following the assault renders his expert testimony on the symptoms of a concussion inadmissible. One issue before the jury was whether the victim sustained a serious physical injury— to wit, a concussion—as a result of the defendant's assault on her. The trial court acted well within its discretion in concluding that Myers had special knowledge suitable to aiding the jury in deciding that issue.[11]

Even if the trial court had abused its discretion in admitting Myers' testimony regarding the symptoms he looks for when evaluating a patient for a concussion, the error was entirely harmless. Myers' testimony was

_____

[11] The defendant cites *Kairon* v. *Burnham*, 120 Conn. App. 291, 991 A.2d 675, cert. denied, 297 Conn. 906, 995 A.2d 634 (2010), and *State* v. *Pjura*, 68 Conn. App. 119, 789 A.2d 1124 (2002), in support of his claim that the trial court's decision to admit Myers' testimony was error. We disagree that either case supports the defendant's claim. *Kairon* and *Pjura* both dealt with experts who were called on to opine on the ultimate issue in the case, namely, whether the defendant had committed medical malpractice in *Kairon*; see *Kairon* v. *Burnham*, supra, 295–96; and whether the defendant was intoxicated in *Pjura*. See *State* v. *Pjura*, supra, 121. In the present case, Myers was not asked to and did not testify as to an ultimate issue, namely, whether the victim had sustained a serious physical injury—a concussion. He simply testified regarding the common symptoms of a concussion, on the basis of his ten years of experience as an EMT and a paramedic. *Kairon* and *Pjura* therefore have no bearing on the outcome of this case.

merely cumulative of the testimony of three other witnesses—Whipple, Sun, and Asante—all of whom testified similarly on the general presenting symptoms of a concussion. In addition, Sun and Asante, both of whom examined the victim following the assault, testified that, in their expert opinions, the victim sustained a concussion as a result of the assault. In light of the foregoing, the defendant cannot prevail on her claim that the trial court's admission of Myers' expert testimony entitles her to a new trial.

The judgment is affirmed.

In this opinion the other justices concurred.

———————————————